**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 13 2002**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BANGERT BROTHERS
CONSTRUCTION COMPANY, INC.;
CSI TRUCKING, INC.,

      Plaintiff - Appellees,

v.

KIEWIT WESTERN COMPANY;
MERIDIAN AGGREGATES
COMPANY; KIEWIT CONSTRUCTION
GROUP, INC.; PETER KIEWIT SONS',
INC.,

      Defendants,

and

EMPIRE LABORATORIES, INC.,

      Defendant - Appellant.

No. 00-1024

---

BANGERT BROTHERS
CONSTRUCTION COMPANY, INC.;
CSI TRUCKING, INC.,

      Plaintiffs - Appellees,

v.

No. 00-1029

KIEWIT WESTERN COMPANY;
KIEWIT CONSTRUCTION GROUP,
INC.; PETER KIEWIT SONS', INC.;
EMPIRE LABORATORIES, INC.,

        Defendants,

and

MERIDIAN AGGREGATES
COMPANY,

        Defendant - Appellant.

---

BANGERT BROTHERS
CONSTRUCTION COMPANY, INC.,

        Plaintiff - Appellant,

and

CSI TRUCKING, INC.,

        Plaintiff,

v.

KIEWIT WESTERN COMPANY;
KIEWIT CONSTRUCTION GROUP,
INC.; PETER KIEWIT SONS', INC.,

        Defendants,

and

MERIDIAN AGGREGATES
COMPANY; EMPIRE
LABORATORIES, INC.,

        Defendants - Appellees.

No. 00-1036

-2-

Thomas R. Buchanan (Linda C. McFee with him on the brief), McDowell, Rice, Smith & Garr, P.C., Kansas City, Missouri, for Defendant-Appellee/Cross-Appellant Empire Laboratories, Inc.

Richard K. Rufner, Law Office of Richard K. Rufner, Englewood, Colorado, for the Defendant-Appellee/Cross-Appellant Meridian Aggregates Company.

John Roger Mann (Charles R. Ledbetter with him on the brief), Kennedy & Christopher, P.C., Denver, Colorado, for Plaintiff-Appellant/Cross-Appellee CSI Trucking, Inc.

Charlotte Wiessner (Michael J. Cook, John W. Mill, Allison H. Lee, with her on the brief), Sherman & Howard, L.L.C., Denver, Colorado, for Plaintiff-Appellant/Cross-Appellee Bangert Brothers Construction Company, Inc.

Jean E. Dubofsky, Jean E. Dubofsky, P.C., Boulder, Colorado; Patrick T. Murphy, McAllister & Murphy, P.C., Denver, Colorado; and Kathryn Haight, Welborn Sullivan Meck & Tooley, Denver, Colorado, on the brief for Defendants Kiewit Western Company and Peter Kiewit Sons', Inc.

Before **BRISCOE**, **ANDERSON**, and **O'BRIEN**, Circuit Judges.

**BRISCOE**, Circuit Judge.

Three related appeals are at issue. In the first appeal, defendant Empire Laboratories, Inc., appeals the district court's partial grant of judgment as a matter of law in favor of plaintiff CSI Trucking, Inc., on its fraudulent misrepresentation claim, as well as the district court's entry of judgment, after trial, in favor of CSI on that same claim. In the second appeal, defendant Meridian Aggregates Company appeals the district court's

entry of judgment, after trial, in favor of plaintiff Bangert Brothers Construction

Company, Inc., on its breach of warranty and negligence claims. In the third appeal,

Bangert challenges the district court's calculation of prejudgment interest on its damage

award against Meridian, and appeals the district court's entry of judgment in favor of

Meridian on its counterclaim for quantum meruit. We exercise jurisdiction pursuant to 28

U.S.C. § 1291, affirm in part, reverse in part, and remand for further proceedings

consistent with this order.

I.

These appeals, and the underlying case, arise out of the construction of Runway

17L-35R at the Denver International Airport. In the summer of 1991, the City and

County of Denver solicited bids for construction of the runway (otherwise known as

Project F-111B). Plaintiff Bangert, a Missouri corporation with its principal place of

business in St. Louis, was the winning bidder and general contractor on the project. As

outlined in its bid, Bangert expected assistance from plaintiff CSI, a minority-owned

business incorporated in Minnesota, and defendant Kiewit Western Company, a Delaware

corporation with offices in Denver. Bangert anticipated that CSI would purchase and

haul many of the raw materials required for paving the runway, and that Kiewit would use

those raw materials to provide Bangert with "batched" concrete necessary for paving the

runway.[1]

CSI entered into a contract with defendant Meridian Aggregates Company for the rock and sand for the project. Kiewit contacted various companies, including River Cement Company, about cement for the project. To manufacture or "batch" concrete, a "mix-design" or recipe is used which sets forth the specific types and amounts of component materials. In late 1991, Kiewit developed and tested several different mix-designs for possible use on the project. Some of the proposed mix-designs met the strength requirements imposed on the project by the City, but others did not. In particular, the proposed mix-designs utilizing Heartland cement supplied by River did not meet the strength requirements. However, because River was willing to lease space from Kiewit in a railyard located near the construction site, Kiewit continued to explore and test mix-designs utilizing Heartland cement.

At the urging of Kiewit, CSI entered into an agreement with River for the cement for the project. In April 1992, River began shipping Heartland cement. Shortly thereafter, Kiewit, on behalf of CSI, hired defendant Empire, a Colorado corporation with its principal place of business in Fort Collins, to perform additional mix-design testing. In particular, Kiewit asked Empire to determine whether Kiewit's proposed mix-designs

---

[1] The precise nature of the agreements among Bangert, CSI, and Kiewit regarding their respective duties on the project was a significant area of dispute during the proceedings in district court. However, because those claims have now been settled, it is unnecessary to discuss them in detail.

utilizing the Heartland cement would satisfy the strength requirements imposed on the project by the City.[2]

Empire employee Gary Martinson, with the assistance of two subordinates, performed the mix-design testing requested by Kiewit. The testing did not produce the results typically expected from concrete mix-designs. In particular, the strength of the concrete did not increase as the percentage of cement in the mix was increased. Nor did the strength of the concrete increase as expected over time (concrete typically gains strength as it ages and hardens). Because the test results "just made no sense at all" to Martinson, Tr. at 5988, he instructed his subordinates to alter the test data to correspond with what he thought the results should have been.[3] Empire prepared a report and submitted it to CSI and Kiewit. App. at 6177. The report did not mention the actual test results or the alterations made by Martinson and his subordinates. Instead, the report outlined the altered test results and concluded that the mix-designs utilizing the Heartland cement satisfied the project strength requirements and were suitable for use in the project.

---

[2] Federal Aviation Administration specifications for the project required that any mix-design had to be tested by an independent laboratory before paving began. Kiewit selected Empire as the independent testing laboratory for its mix-designs.

[3] The testing was performed on a "Rainhart machine," which is used to determine the flexural strength of concrete beams. Tr. at 1864. The machine graphically records, on a piece of paper called a "Rainhart wheel," the pressure per square inch a concrete beam can withstand before it breaks. Id. As increasing pressure is applied to a beam by the machine, a red-ink marker records the pressure on the Rainhart wheel. When the beam breaks, the red line automatically stops at the point showing the maximum pressure applied. Here, the Empire technicians physically extended the red ink lines on many Rainhart wheels, falsely suggesting the beams were stronger than they were.

Copies of the report were sent to Bangert and, in turn, to the City.

Paving operations began on the project in mid-June 1992 and problems arose almost immediately. As a general matter, the concrete "didn't work very well" and was difficult for Bangert's paving personnel to handle. Tr. at 508 (testimony of Henry Bangert). By the third day of paving, Bangert began experiencing problems with the field strength tests on the concrete. Id. These low-strength problems continued off and on throughout the summer of 1992. In mid-July 1992, Bangert discovered that some of the concrete panels were contaminated with "clayballs." Id. at 515. In September 1992, large quantities of concrete failed to "set up properly," which in turn led to random cracking of the concrete. Id. at 529. In addition, some of the concrete failed to set at all and remained in a "retarded" state similar to gelatin. Id. at 531.

Bangert investigated and attempted to correct these problems. With respect to the low-strength problem, Bangert experimented with the mix-designs, changing the amounts of cement, fly ash, and admixture in an attempt to increase the concrete's strength. Bangert concluded there was a relationship between the low-strength problem (and the retardation and cracking problems) and the Heartland cement supplied by River. Bangert further discovered that, adding to the problem, River had shipped three different types of cement to the job site and those three types had been intermingled during the concrete batching process. In the fall of 1992, Bangert, with the approval of the City, switched cement suppliers and discontinued using any cement supplied by River.

Bangert attributed the clayball problem to several potential sources. First, Bangert concluded there was clay in the sand stockpile. Second, Bangert concluded that at least some of the rock in the rock stockpile was too dirty to use for batching concrete. Third, Bangert believed that muddy conditions at the batch plant site, as a result of wet weather and a rock-washing operation implemented to counter the dirty rock problem, resulted in loading equipment introducing clay into the batched concrete.

The concrete problems encountered on the project in the summer of 1992 had significant ramifications. As a result of the low-strength problems, the City deducted $410,000 from its payments to Bangert. Id. at 538. In addition, Bangert spent the majority of 1993 replacing and repairing panels of concrete. Id. at 502. In particular, of the 781 panels of concrete (each measuring 25 feet by 25 feet by 17 inches thick) poured by Bangert between July 21 and September 16, 1992, 332 had to be removed and 206 repaired as a result of the failure of the concrete to properly set. Id. at 583. Bangert also had to replace or repair a number of the panels affected by the clayball problem (which were poured prior to July 21, 1992). Id. at 567-69. In total, Bangert was ordered by the City to replace or repair over 600 panels of defective concrete.

In 1993, while the project was still ongoing, CSI filed for Chapter 7 bankruptcy protection in Minnesota. CSI sued Bangert and Kiewit, and that adversary proceeding was transferred by the bankruptcy court to federal district court in Colorado. Thereafter, Bangert and CSI were realigned as plaintiffs and other defendants, including Empire and

Meridian, were added. CSI asserted claims against Empire for fraudulent and negligent misrepresentation based on Empire's falsification of the mix-design test results. Bangert asserted negligence and breach of express and implied warranty claims against Meridian based on its assertion that Meridian provided contaminated sand and rock to the project and was responsible (at least in part) for the clayball problem. Meridian asserted two counterclaims against Bangert: a legal claim under the Colorado Public Works Act (CPWA), Colo. Rev. Stat. § 38-26-105, and an equitable claim for quantum meruit. The basis for both claims was Meridian's assertion that it had not been paid fully for the materials it provided to the project. A jury awarded CSI compensatory damages of $617,140 and punitive damages in the same amount on its fraud claim against Empire. With respect to Bangert's negligence and breach of warranty claims against Meridian, the jury found in favor of Bangert and awarded total damages of $1,252,420. With respect to Meridian's counterclaim against Bangert under the CPWA, the jury found in favor of Bangert.

After trial, the district court found in favor of Meridian on its counterclaim against Bangert for quantum meruit and awarded Meridian $1,346,142 in compensatory damages, plus prejudgment interest. The district court awarded prejudgment interest to Bangert on its successful claims from the first day of trial until the date of judgment. The district court also awarded prejudgment interest to CSI on its successful claims from January 1, 1994 (the date its claims accrued), to the date of judgment.

II.

### *Empire's Appeal (Case No. 00-1024)*

*Grant of JMOL in favor of CSI -- fraud claim*

Empire contends the district court erred in granting partial judgment as a matter of law in favor of CSI on its fraudulent misrepresentation claim against Empire. We review de novo a district court's grant of a motion for judgment as a matter of law, applying the same standard utilized by the district court. See Black v. M&W Gear Co., 269 F.3d 1220, 1238 (10th Cir. 2001). Judgment as a matter of law is appropriate only "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1).

At the close of all the evidence, CSI moved for judgment as a matter of law on its fraudulent misrepresentation claim against Empire. The district court granted the motion in part, leaving the issue of CSI's damages for the jury. Tr. at 7109-10. Empire contends the court erred, asserting that it presented sufficient evidence to create a genuine issue of material fact concerning whether it committed fraud. In particular, Empire points to the trial testimony of Martinson (in which Martinson testified that he believed the altered test results more accurately reflected the strength of the mix-designs) and suggests that his testimony, "if believed, would [have] allow[ed] the jury to conclude that he adjusted the test results not for the purpose of misrepresenting the strength of the concrete, but rather

-10-

to present what he believed to be accurate information." Empire's Opening Br. at 36. In other words, Empire argues that the district court improperly focused only on the altered test results, when in fact those altered test results accurately portrayed the strength of the concrete mix-designs.

Empire's arguments hinge on a misperception of the "material fact" underlying the plaintiffs' fraud claims.[4] Empire continues to assert on appeal that the "material fact" at issue is not the altered flexural strength test results, but rather the professional opinions it offered to CSI regarding the flexural strength of the concrete mix-designs. We agree with the district court, however, that the opposite is true. It was uncontroverted that Martinson and his subordinates altered the flexural strength test results and reported only the altered test results to CSI and the other entities. Further, it was uncontroverted that the actual test results would not have been sufficient to meet the project guidelines. Thus, even though Empire attempted to present evidence (gathered after the fact) suggesting that the altered test results accurately portrayed the strength of concrete produced by the proposed mix-designs, the key point is that Empire failed to inform CSI and the other entities of the actual test results. Had Empire done so, and then opined that the actual test results did

---

[4] "The elements of fraud [under Colorado law] are: (1) a false representation of a material existing fact; (2) knowledge on the part of the one making the representation that it was false; (3) ignorance on the part of the one to whom the representation was made of its falsity; (4) the representation was made with an intention that it be acted on; and (5) the representation resulted in damage." Southeastern Colo. Water Conservancy Dist. v. Cache Creek Mining Trust, 854 P.2d 167, 172 (Colo. 1993).

not accurately portray the strength of the concrete produced by the mix-designs, there would have been no fraud. In other words, there would have been no misrepresentation of any fact, and CSI and the other entities could have determined whether they agreed with Empire's professional opinion regarding the likelihood of the proposed mix-designs producing concrete of sufficient strength. However, because Empire failed to disclose that it had altered the test results, neither CSI nor any other entity involved in the project knew or had reason to know there might be a problem with the proposed mix-designs.

We agree with the plaintiffs and the district court that the "material fact" misrepresented by Empire was the flexural strength test results. Because it was uncontroverted that Empire misrepresented these results to CSI, and because CSI relied on the misrepresentations to its detriment (i.e., CSI assumed that the proposed mix-designs would result in concrete that met the project's strength requirements), it is irrelevant that Martinson may have had good intentions when he altered the test results. More specifically, CSI, as well as Bangert and the City, were deprived of the true results of the flexural strength tests which, despite Martinson's opinion to the contrary, indicated that the proposed mix-designs would not produce concrete that routinely satisfied the project's strength requirements. Had CSI, Bangert and the City been aware of the true test results, it is uncontroverted that the proposed mix-designs would not have been accepted, and there is a strong possibility that River would not have been selected as a supplier for the project. For these reasons, we conclude the district court properly granted

partial judgment as a matter of law in favor of CSI on its fraudulent misrepresentation claim against Empire.

*Failure to instruct - apportionment of fault*

Empire contends the district court erred in refusing to instruct the jury to apportion fault and damages among all entities whose conduct, whether intentional or otherwise, contributed to CSI's injuries. In particular, Empire points to the conduct of River, which was originally named a defendant in the action but settled with Bangert and CSI prior to trial. According to Empire, River was largely responsible for the concrete problems because, unbeknownst to Bangert and CSI, it shipped multiple types of cement to the job site and those cements were commingled and mixed, in varying amounts, in the batches of concrete used for paving. We review for abuse of discretion a district court's refusal to give a particular instruction. Allison v. Bank One-Denver, 289 F.3d 1223, 1241 (10th Cir. 2002). In doing so, we also "consider the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law." Id.

Empire's request for a comparative-fault instruction was based on Colo. Rev. Stat. § 13-21-111.5, entitled "Civil liability cases – pro rata liability of defendants," which provides:

> (1) In an action brought as a result of . . . an injury to person or property, no defendant shall be liable for an amount greater than that represented by the degree or percentage of the negligence or fault attributable to such defendant that produced the claimed injury, death,

-13-

damage, or loss, except as provided in subsection (4) of this section.

Empire also relied heavily on Harvey v. Farmers Insurance Exchange, 983 P.2d 34 (Colo. Ct. App. 1998), a decision issued during the trial in the instant case. In Harvey, two insureds, as well as one of the insureds' spouses, filed suit against their mutual automobile insurer for referring the insureds to a chiropractor who sexually assaulted them during the course of independent medical examinations requested by the insurer. Although the insureds also initially named the chiropractor as a defendant, the chiropractor settled with the insureds and was dismissed from the suit. The insurer then named the chiropractor as a non-party at fault pursuant to § 13-21-111.5(3)(b). At trial, the jury was instructed, over the insureds' objections, to apportion fault between the insurer and the chiropractor, the alleged non-party at fault, on all tort claims in which the jury found in favor of the insureds. After deliberating, the jury found in favor of the insurer as to all claims asserted by one of the insureds (the insured first referred by the insurer to the chiropractor). The jury found in favor of the remaining insured (who was referred by the insurer to the chiropractor after it had notice of the chiropractor's assault on the first insured) on her claims of willful and wanton negligence and bad faith breach of an insurance contract, and in favor of the remaining insured's spouse on his claim of loss of consortium. With respect to those claims, the jury found the insurer 40% at fault and the chiropractor 60% at fault, and damages were apportioned accordingly.

On appeal, the prevailing insured argued, in part, that the apportionment of

damages between the insurer and the chiropractor on her bad faith claim was incorrect because the chiropractor owed no duty to her and because the insured's duty of good faith was nondelegable. Before addressing these issues, the court considered "whether apportionment of liability [wa]s proper between defendants, or between defendants and designated non-parties at fault, when one or more [we]re negligent by failing to use reasonable care to prevent the foreseeable harm resulting from the intentional tort of one or more others." 983 P.2d at 37. After examining § 13-21-111.5(1) and its legislative history, the court concluded that "the word 'fault' as it appears in the statute was intended [by the Colorado legislature] to include a broad range of blameworthy conduct, including intentional torts." 983 P.2d at 38. The court therefore held

> that § 13-21-111.5(1) wa[s] intended to apportion fault, and therefore liability for damages, between defendants, or between defendants and designated non-parties at fault, where one or more of such persons or entities [we]re negligent by failing to use reasonable care to prevent the foreseeable harm resulting from the intentional tort of one or more of the others.

Id. at 39.

The district court in the instant case reviewed Harvey and concluded it was not controlling. Specifically, the district court emphasized that the discussion of comparative fault in Harvey arose in connection with a negligence claim asserted by the insured against her insurer, and not in the context of an intentional tort claim such as the fraud claims asserted by CSI against Empire. Tr. at 7673. Further, the district court found the Harvey decision unpersuasive:

I don't choose to buy into that interpretation at this juncture because I think it's too radical a change in Colorado law for this court to basically go forward on without more authority than one opinion from the Court of Appeals. And I am not at all sure that the opinion from the Court of Appeals is totally persuasive, anyway, because it does apply to a negligence case. It's broad. The very language you quoted me is extremely broad.

Id. at 7676. Having rejected Empire's requested instruction, the district court instructed the jury as follows with respect to CSI's claim for fraud against Empire:

You may not take into account any other claims asserted by CSI against any other defendant, the amount of damages, if any, that you may award to CSI on those claims or the basis for such award. Your award if any, should be for the full amount of compensatory damages awarded to CSI on this claim caused by this defendant without regard to any amounts CSI may recover on other claims against this or other defendants.

Joint App. at 7787-88.

After the verdict, Empire moved for a new trial arguing, in part, that the district court erred in refusing the requested apportionment of fault instruction. Id. at 4300. Empire also asked the district court to certify the apportionment of fault issue to the Colorado Supreme Court. Id. at 4715. The district court rejected Empire's request for certification, noting that the Colorado Supreme Court had granted certiorari in the Harvey case and was "sure to discuss" the relevant issues "in its opinion on the case." Id. at 4730. The district court further noted that the decision in Harvey would "be available for consideration by the court considering the appeal in this case." Id. Consistent with its ruling on Empire's motion for certification, the district court also denied Empire's motion for new trial. Id. at 4764.

While this case was pending on appeal, the Colorado Supreme Court affirmed the decision in Harvey.  See Slack v. Farmers Ins. Exchange, 5 P.3d 280 (Colo. 2000).  In its ruling, the court framed the question broadly as "whether section 13-21-111.5 . . . requires the pro rata distribution of civil liability among intentional and negligent tortfeasors who jointly cause indivisible injuries."  Id. at 282.  In other words, the court stated, the question was whether the Colorado "General Assembly intended that liability . . . be apportioned only between negligent tortfeasors, or also between a negligent and an intentional tortfeasor."  Id. at 284.  Examining the language of § 13-21-111.5(1), the court first concluded that the statute's reference to "an action brought as a result of a death or an injury to person or property," "on its face . . . would cover . . . intentional torts [such as] assault and battery."  Id.  The court noted that the statute contained "not only a reference to the negligence of a defendant, but also to the 'fault' attributable to a defendant."  Id. at 285.  The court concluded that the "common understanding" of the term "fault" "contemplate[d] more than mere negligence, and include[d] intentional acts."  Id.  Based upon its interpretation of the statutory language, the court "conclude[d] that section 13-21-111.5(1) applies even when one of several tortfeasors commits an intentional tort that contributes to an indivisible injury."  Id. at 286.

After reaching its conclusion regarding the meaning of § 13-21-111.5(1), the Colorado Supreme Court rejected the appellant/insured's argument that, "since [the chiropractor] was an intentional actor, [the insurer] not [the chiropractor] should bear a

-17-

greater proportion of the loss." Id.  More specifically, the court stated:

> In our estimation, the public policy rationale for apportioning the loss commensurate with wrongdoing is even more compelling when an intentional tortfeasor contributes to the injury.  Under the terms of the statute, a negligent actor is only responsible for his contribution to an injury, irrespective of whether the other tortfeasor accidentally or purposefully injured the victim.  To hold otherwise would lead to the anomaly that a negligent tortfeasor would bear the full risk of the injury if the other tortfeasor purposefully injured the victim, but only his portion of the risk if the other actor were negligent.  If any disproportionate responsibility were to be assessed, it would more logically fall upon the intentional tortfeasor–not the negligent one.  (Footnote omitted.) <u>Nonetheless, section 13-21-111.5 demonstrates the General Assembly's intent that a tortfeasor should pay only for the portion of the injury he caused.</u>

Id. at 286-87 (emphasis added).

Based upon the decision in <u>Slack,</u> we have little choice but to conclude the district court erred in refusing to instruct the jury to apportion fault among Empire for its false representations and the other entities alleged by Empire to have contributed to CSI's injuries.  Although the district court accurately characterized <u>Harvey</u> as a "radical" change in Colorado law, the decision in <u>Slack</u> clearly affirms <u>Harvey</u>'s interpretation of Colorado law.  Moreover, the opinion in <u>Slack</u> makes clear that <u>Harvey</u>'s interpretation of § 13-21-111.5(1) applies to situations such as that presented here where an intentional act precedes the alleged negligent act(s) of others.

The question becomes whether the district court's error prejudiced Empire. Harmless error analysis generally applies in civil cases involving instructional error.  <u>See</u> <u>Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.,</u> 175 F.3d 1221, 1235 (10th Cir.

-18-

1999). An "[i]nstructional error requires reversal only if the error is determined to have been prejudicial, based on a review of the record as a whole." Id. (internal quotations omitted); see also Bohrer v. DeHart, 961 P.2d 472, 476 (Colo. 1998) (noting that under Colorado law a jury verdict may not be set aside based upon trial error unless the error is inconsistent with substantial justice).

CSI contends that any error on the part of the district court in failing to instruct the jury in accordance with § 13-21-111.5(1) was harmless. More specifically, CSI contends there was no need for an apportionment of fault instruction, as required by § 13-21-111.5(1), "because the jury was expressly instructed to award damages only for injuries that Plaintiffs proved were proximately caused by each Defendant's conduct without regard to any damages Plaintiffs may recover on other claims against that or any other Defendant." Response Br. at 74. CSI further notes that the district court utilized separate verdict forms for each claim against each defendant. In CSI's view, the instructions and verdict forms, taken together, "were the functional equivalent of an instruction to apportion liability between Defendants." Id. Additionally, CSI argues that any culpability of River was adequately addressed by the district court's instructions on intervening cause. Id. at 76. In particular, CSI argues that, "[h]ad the jury accepted that Empire was an innocent participant and that River was the true culprit, the [intervening cause] instructions properly directed the jury to award only damages caused by it." Id. at 77.

-19-

Contrary to CSI's arguments, we conclude that the district court's instructions, considered as a whole, were not the "functional equivalent" of the apportionment of fault instructions specifically required by § 13-21-111.5(1). The district court's general instruction to the jury on assessing damages in connection with Empire's false representations gave the jury no room for apportioning fault among Empire and other entities. Although it is true that the court instructed the jury not to "take into account any other claims asserted by CSI against any other defendant," Joint App. at 7787, that instruction did not allow the jury to consider whether River was partially responsible for the injuries sustained by CSI during the course of its paving operations. Further, although it is true the court gave an intervening cause instruction,[5] that instruction was not the

---

[5] The district court's "intervening cause" instruction stated, in pertinent part, as follows:

> If more than one cause contributed to CSI's claimed damages, then each may have been a cause of the damages.
> It is not necessary that CSI prove that the alterations were the sole and exclusive cause of the alleged damages, or the latest cause. What CSI must prove by a preponderance of the evidence is that the alterations of the test results were a significant cause, without which the damages would not have occurred. This requires a showing that the alterations of the test results were a "but for" cause of CSI's alleged damages.
> In making that determination, the jury must take into account the foreseeability of the damages and whether any other independent cause or causes, not related to the alteration of the test results and not reasonably foreseeable, intervened after the alterations and were a significant cause of CSI's damages.
> * * *
> If Empire has proved by a preponderance of the evidence that other conduct not reasonably foreseeable intervened after the alterations of the test results and caused the alleged damages, then the jury cannot return a

-20-

equivalent of an apportionment of fault instruction. Indeed, in <u>Redden v. SCI Colorado Funeral Serv., Inc.</u>, 38 P.3d 75 (Colo. 2001), the Colorado Supreme Court recently distinguished between the defense of intervening cause and a defense under § 13-21-111.5(1) asserting that a non-party is partially at fault. In particular, the court stated: "A defense that the defendant did not cause the plaintiff's injuries [i.e., there was an intervening cause of the injuries] is not equivalent to the designation of a non-party because it cannot result in apportionment of liability, but rather is a complete defense if successful." <u>Id.</u> at 81. This statement refutes CSI's suggestion that the district court's inclusion of an intervening cause instruction was the "functional equivalent" of an apportionment of fault instruction. Finally, the jury reasonably could have determined that River's conduct was not an "intervening cause," but that River was partially responsible for the injuries sustained by CSI. More specifically, under the district court's intervening cause instruction, the jury could have determined that River's conduct in shipping different types of cement was a partial cause of CSI's injuries that was not reasonably foreseeable, but was nevertheless "related to" Empire's alteration of test results in that, were it not for the altered test results, River would not have been the supplier of cement for the project.

CSI has asserted one additional argument that requires mention. Less than a week

_____

verdict for any amounts of damages caused by such intervening causes. Joint App. at 7789.

-21-

prior to oral argument in this case, CSI filed a notice of supplemental authority citing Town of Alma v. Azco Constr., Inc., 10 P.3d 1256, 1259 (Colo. 2000) ("address[ing] the status of the economic loss rule in Colorado"), and Grynberg v. Agri Tech, Inc., 10 P.3d 1267 (Colo. 2000) (same). At oral argument, CSI cited these cases and asserted that it was unnecessary for the district court to give Empire's requested apportionment of fault instruction because River's duty to CSI was strictly contractual and River had no independent duty of care toward CSI under Colorado tort law. Because this argument was not asserted in the district court or in CSI's appellate briefs, and was asserted for the first time in CSI's notice of supplemental authority, it is deemed waived. Hooks v. Ward, 184 F.3d 1206, 1233 n.25 (10th Cir. 1999). While the two cases now cited were not available when the jury was instructed, the argument CSI now seeks to assert was nonetheless available to it.

Having concluded that Empire was prejudiced by the district court's failure to give an apportionment of fault instruction, we reverse the damage award in favor of CSI on its fraudulent misrepresentation claim against Empire and remand the issue of CSI's damages to the district court for further proceedings.[6]

---

[6] Our holding does not affect the district court's partial grant of judgment as a matter of law in favor of CSI and against Empire.

*Sufficiency of evidence – punitive damages*

Empire contends there was insufficient evidence to support the jury's punitive damage award on CSI's fraudulent misrepresentation claim. We will not address this argument since we are reversing the damage award entered in favor of CSI on its fraudulent misrepresentation claim and remanding for further proceedings.

***Meridian's Appeal (Case No. 00-1029)***

*Sufficiency of evidence – breach of warranty claims*

Meridian contends the evidence presented at trial was insufficient to support the jury's verdict on Bangert's breach of express and implied warranty claims. "When a jury verdict is challenged on appeal, our review is limited to determining whether the record--viewed in the light most favorable to the prevailing party--contains substantial evidence to support the jury's decision." United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd., 210 F.3d 1207, 1227 (10th Cir. 2000) (internal quotations omitted). "Substantial evidence is something less than the weight of the evidence, and is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, even if different conclusions also might be supported by the evidence." Webco Indus., Inc. v. Thermatool Corp., 278 F.3d 1120, 1128 (10th Cir. 2002) (internal quotations omitted).

With respect to Bangert's claim against Meridian for breach of implied warranty of merchantability, the district court instructed the jury, without objection from Meridian,

that it must find the following elements for Bangert to prevail:

1.  Meridian sold the sand and rock aggregates for use on the F-111B Project;
2.  Bangert [wa]s an entity . . . reasonably expected to use the sand and rock aggregates;
3.  Meridian was a merchant with respect to the type of product involved herein;
4.  The sand and rock aggregates were not of merchantable quality at the time of sale;
5.  This breach of warranty caused Bangert damages; and
6.  Within a reasonable time after the alleged breach of warranty was discovered or should have been discovered, Bangert gave notice to Meridian or Meridian received notice of such breach.

Joint App. at 7611. We construe Meridian's appellate pleadings as challenging only two of these elements. First, Meridian challenges the sufficiency of the evidence on the fourth element, asserting "[t]he record is totally devoid of any evidence to establish the coarse concrete aggregate or the sand as supplied by [it] contained mud/clayballs at the time of delivery." Meridian's Opening Br. at 13. Second, Meridian challenges the sufficiency of the evidence on the fifth element, asserting there "were a number of potential causes of the clayball contamination of the concrete, [and] there was insufficient evidence to establish that Meridian was the direct cause of the clayballs." Id. at 15.

With regard to the merchantable quality issue, we conclude that the record contains substantial evidence to support the jury's verdict. Several witnesses involved in the project testified they personally observed clay in the sand stockpile at the job site. Tr. at 558, 657 (Henry Bangert), 2715, 2853 (Daniel DeGraaf), 2902-03, 2985 (Jerry Camper), 3057 (Douglas Logue), 4686 (Douglas Ruder). One witness, Kiewit employee Jerry

-24-

Camper, testified that, throughout the course of the project, he personally observed clayballs in the sand being delivered to the project site. Id. at 2902-03, 2985. Another Kiewit employee, Daniel DeGraaf, testified that on one occasion Kiewit decided to return an amount of dirty sand to Meridian so that it could be washed properly. Id. at 2715; see also id. at 4686 (testimony of Douglas Ruder supporting DeGraaf's testimony). DeGraaf further testified that he and CSI owner Steve Chaves drove to the sand pit where Meridian's sand originated and informed Meridian that its sand would have to be washed before being shipped to the project site. Id. at 2717. Taken together, this evidence was adequate to support the jury's finding that the sand provided by Meridian for the project was not of merchantable quality.

Similarly, several witnesses testified that the rock delivered by Meridian to the project site was dirty and required rewashing before it could be used in the concrete batching process.[7] For example, Henry Bangert, the vice president in charge of construction for plaintiff Bangert, testified that his company concluded that the rock provided by Meridian was too dirty to use without being rewashed on-site. Tr. at 510.

---

[7] In its response brief, Bangert contends "[t]he jury was not required to make separate findings or issue separate verdicts for breach of warranty regarding contaminated rock on the one hand, and contaminated sand on the other." Bangert's Response Br. at 103. "Thus," Bangert argues, it "need only show a basis in the record supporting breach of warranty on one of these products." Id. Although Bangert's argument seems reasonable at first blush, it is not consistent with the district court's jury instructions, which stated that the jury had to find that "[t]he sand and rock aggregates were not of merchantable quality at the time of sale." Joint App. at 7611 (emphasis added).

-25-

Steve Chaves, the owner of plaintiff CSI, testified that Meridian itself concluded the rock it had initially delivered to the project site was too dirty and needed to be rewashed. Id. at 4241. Taken together, this evidence was likewise adequate to support the jury's finding that the rock supplied by Meridian to the project was not merchantable without being rewashed at the job site.

The remaining issue is whether there was sufficient evidence to allow the jury to find that the breaches of warranty caused Bangert damages. There was very little direct evidence indicating that the dirty sand provided by Meridian caused the clayball problems encountered by Bangert in late June and July of 1992.[8] At best, Bangert vice president Henry Bangert testified that Meridian was responsible for the clayball damages incurred by Bangert because, in part, of the contaminated sand. Tr. at 693. Notwithstanding the relative lack of direct evidence, however, we conclude the jury reasonably could have inferred from the testimony outlined that the dirty sand was a contributing factor. More specifically, given the testimony of various witnesses describing actual clayballs in the sand stockpile, we conclude the jury reasonably could have inferred those clayballs in turn made it into the concrete that was initially produced (since the testimony indicated

---

[8] Kiewit employee Jerry Camper arguably provided direct testimony linking the sand contamination to the clayball problems experienced by Bangert during the initial course of paving. In particular, Camper pointed to the sand contamination as one of four specific causes of the clayball problem. Tr. at 2902-03. On cross-examination, however, Camper stated that the dirty sand would not have caused the clayball problem. Id. at 2965.

that when the concrete batching process began there was no scalper screen to keep contamination from the sand) and resulted in contamination of at least some of the concrete initially poured.

As for the dirty rock, Bangert vice president Henry Bangert testified that the rewashing process implemented by the parties to deal with the problem greatly increased the amount of water and mud that was present on the job site. Tr. at 511, 556-57, 693. Bangert's testimony on this point was bolstered by the testimony of Kiewit employee Jerry Camper, who testified that the stockpile areas were located in low-lying areas and did not drain properly. Id. at 2893. Henry Bangert further testified that these conditions increased the amount of mud transferred from the loading equipment into the concrete batching process, thereby resulting in the clayball problems experienced by Bangert. Id. at 511. Considered together, this testimony was sufficient to support the jury's finding that the breach of implied warranty injured Bangert.

With respect to Bangert's claim against Meridian for breach of express warranty, the district court instructed the jury, without objection from Meridian, that it had to find the following elements in order for Bangert to prevail:

1. Meridian furnished sand and rock aggregates for use on the F-111B Project;
2. Meridian expressly warranted that the aggregates would comply with the Project's specifications and would be properly washed and free from contamination;
3. Bangert [wa]s a company that Meridian reasonably expected to use the sand and rock aggregates;
4. The aggregates were not as warranted;

5.     This breach of warranty caused Bangert damages; and

6.     Within a reasonable time after the alleged breach of warranty was discovered or should have been discovered, Bangert gave notice to Meridian or Meridian received notice of such breach.

Joint App. at 7623.

Meridian does not raise any additional arguments with regard to this claim. Instead, Meridian argues, as it did with the breach of implied warranty claim, there was insufficient evidence to prove (1) the rock and sand were contaminated, and (2) that any contamination of the rock and sand resulted in injury to Bangert. For the reasons outlined, we conclude there was sufficient evidence to support the jury's finding in favor of Bangert on both issues.

*Foreseeability of consequential damages*

Meridian contends it should not be held liable for the clayball damages incurred by Bangert because those damages were not a reasonably foreseeable consequence of the alleged breaches of warranty. Meridian's contention is based on two related points. First, Meridian asserts "there was absolutely no evidence that the materials [it] supplied . . . were contaminated with clayballs/mud at the point of delivery." Meridian's Opening Br. at 18. Second, and relatedly, Meridian contends that "the only theory upon which Bangert might rest its warranty claims . . . is that Meridian delivered two train loads of dirty rock." Id. at 18-19. Meridian asserts that "clayball contamination does not ordinarily and naturally flow from dirty rock." Id. at 20. Instead, Meridian asserts that any increased

-28-

mud on the project site was the result of Kiewit's preparation of the batch site and CSI's operation of the rock-washing equipment.

As Bangert correctly notes, Meridian did not raise this issue in district court. Although Meridian suggests that it preserved the issue by moving for judgment as a matter of law on the general grounds "that Bangert had not introduced evidence to support the negligence and warranty claims against it," Meridian's Reply Br. at 8, it is apparent from reviewing the record on appeal that nothing in Meridian's arguments at trial alerted the district court to the fact that Meridian was challenging the foreseeability of damages. See Vanderhurst v. Colorado Mountain Coll. Dist., 208 F.3d 908, 918 (10th Cir. 2000). Accordingly, the issue has been waived for purposes of appeal. See Allison v. Bank One-Denver, 289 F.3d 1223, 1244 (10th Cir. 2002) ("We have held consistently that issues raised but not pursued at trial cannot be the basis for an appeal."). Even if we were to overlook Meridian's waiver, we conclude there is no merit to its argument on foreseeability. The foundation for Meridian's argument is that neither the sand nor the rock was contaminated when delivered to the project site. For the reasons discussed above, the evidence presented at trial was clearly sufficient to allow the jury to conclude otherwise.

*Damages - proximate cause*

Meridian contends that Bangert should be precluded from recovering any damages

for the clayball problem because Bangert was aware of clayball contamination in the sand prior to, or at least during, the initial paving operations. As with the previous issue, there is no indication in the record that Meridian presented this argument to the district court and Meridian has waived it for purposes of appeal. Even overlooking the waiver, we note that Meridian was able to present evidence and argument at trial that Bangert failed to mitigate its damages (e.g., by stopping paving operations). Because the jury considered and rejected the mitigation of damages argument, Meridian has no basis for appeal.

*Instructions - Meridian's counterclaim under CPWA*

Meridian contends the district court failed to properly instruct the jury regarding its counterclaim against Bangert under the CPWA, Colo. Rev. Stat. § 38-26-105, which creates a remedy designed to protect suppliers of labor and material for public works projects. More specifically, Meridian complains that the district court "simply instructed the jury by reading the exact language" of the CPWA, rather than "explaining that it was [not] necessary that Meridian be in privity of contract with Bangert" and that "such a claim only requires a claimant to prove that its labor or materials were incorporated into the work or consumed in performing the work in order to prevail." Meridian's Opening Br. at 22-23. As previously noted, we review the district court's decision to give a particular jury instruction for abuse of discretion and consider the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law.

Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 962 (10th Cir. 2002). "An error in jury instructions requires reversal only if it was prejudicial in light of the whole record." Id.

Meridian has waived any error arising out of the district court's failure to instruct the jury regarding privity, or the lack thereof, between Bangert and Meridian. As noted by Bangert, there is no indication in the record that Meridian submitted a proposed instruction discussing the privity issue, nor is there any indication in the transcript that Meridian's counsel raised the privity issue during the formal instruction conference. Therefore, Meridian is precluded from raising the issue for the first time on appeal. See Allison, 289 F.3d at 1244.

We conclude there is no merit to Meridian's remaining argument.[9] In instructing the jury with regard to Meridian's claim under the CPWA, the district court stated, in pertinent part, that it was necessary for Meridian to prove by a preponderance of the evidence that it "supplied materials used in the prosecution of the work on Project F-111B." Joint App. at 7812. This language was derived directly from the CPWA, which

---

[9] Meridian has made review of this argument difficult by failing to include in the record on appeal a copy of the proposed jury instruction(s) it submitted to the district court on its CPWA counterclaim, and by failing to cite the portions of the transcript where the district court ruled on its argument. We have conducted an independent review of the trial transcript and note there was a brief discussion of the issue during the formal instruction conference (but the discussion also suggests there was a more complete discussion at an earlier, untranscribed instruction conference). Tr. at 7804.

provides that a contractor on a public works project "shall at all times promptly make payments of all amounts lawfully due to all persons supplying or furnishing such person or such person's subcontractors with . . . materials . . . used . . . in the prosecution of the work." Colo. Rev. Stat. § 38-26-105(1). Although "[i]t is true that the recitation of statutory language [in a jury instruction] does not preclude a finding of error," Summers v. Missouri Pacific R.R. Sys., 132 F.3d 599, 607 (10th Cir. 1997), we conclude there was no error in this case. Contrary to Meridian's assertions that the statutory language was confusing and should have been defined more precisely, we conclude the language used by the district court was reasonably capable of being understood by the jury. In particular, the term "prosecution" is commonly defined to mean the "carrying out of any action, scheme, or purpose, with a view to its accomplishment or attainment." Oxford English Dictionary (2d ed. 1989). As used in the district court's instruction, the term would have indicated to the jury that it was necessary only that the materials supplied by Meridian were used in carrying out the F-111B project, and not that the materials had to be incorporated specifically into the concrete.

### *Plaintiff Bangert's Cross-Appeal (Case No. 00-1036)*

*Prejudgment interest - accrual date*

Plaintiff Bangert contends the district court erred in establishing the accrual date for prejudgment interest on its compensatory damages against Meridian. According to Bangert, it was entitled to prejudgment interest accruing from the date of Meridian's

wrongful conduct rather than the date of the trial as established by the district court. Prejudgment interest questions in diversity cases are governed by state law. Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1156 (10th Cir. 2000). Although an award of prejudgment interest generally is subject to review for abuse of discretion, any statutory interpretation or legal analysis is reviewed de novo. Id.

Under Colorado law, a prevailing party is entitled to prejudgment interest "[w]hen money or property has been wrongfully withheld." Colo. Rev. Stat. § 5-12-102(1)(a). Colorado law further provides that the prejudgment "interest shall be an amount which fully recognizes the gain or benefit realized by the person withholding such money or property from the date of wrongful withholding to the date of payment or to the date judgment is entered, whichever first occurs." Id. We previously have held that Colorado's prejudgment interest statute operates in favor of victims of tortious conduct. See United Int'l, 210 F.3d at 1234 (citing Estate of Korf v. A.O. Smith Harvestore Prod., Inc., 917 F.2d 480, 486 (10th Cir. 1990)).

Although the district court concluded that Bangert was entitled to prejudgment interest under Colorado law, it awarded such interest only from the first day of trial, September 8, 1998, until the date judgment was entered. Joint App. at 4106-07. In doing so, the district court noted that Bangert presented evidence to the jury in the form of Exhibit 583A, which listed Bangert's alleged damages and included interest on the damages from January 1, 1994, to the first day of trial. Id. at 4106. The district court

-33-

further noted that the jury was instructed to fully compensate Bangert for the damages it incurred. Id. at 4107. Based on these factors, the district court "presumed that the jury followed their charge" and included prejudgment interest in its damage award. Id. Thus, the district court concluded that awarding prejudgment interest to Bangert from the date of its wrongful conduct would result in a double-recovery of interest (or at least a partial double-recovery) for Bangert.

Although Bangert acknowledges that its exhibit 583A included interest calculations, it offers several reasons why this was an insufficient basis for the district court's decision. First, Bangert points out that "[n]o one objected to that exhibit on that ground." Bangert's Amended Reply Br. at 5. Second, Bangert notes that it "promptly corrected the situation, and later damages exhibits did not include interest." Id. Third, "[n]either of Bangert's damages experts included interest in his analysis." Id. Fourth, "Bangert did not ask the jury to award any interest" during closing arguments, and Meridian's counsel told the jury during closing arguments that the calculated interest had been stricken from Bangert's claim and the jury could "forget" interest.[10] Id. Fifth,

_____

[10] During closing arguments, Meridian's lead counsel specifically discussed the damages exhibit to which the district court referred and stated: "We can start out – because after it initially was brought to the jury's attention, they [Bangert] struck out the interest charges. So this section [the interest section] is out of the claim [asserted by Bangert against Meridian]. So we can forget about that part of it." Tr. at 7471. Later in the same argument, Meridian's counsel noted that "we have taken the interest out of here [i.e., out of Bangert's damages exhibit]." Id. at 7484. Nowhere in Bangert's closing arguments did it contradict this statement or otherwise request that the jury award interest.

-34-

Bangert notes that the district court did not instruct the jury to award prejudgment interest on any of the claims. Sixth, Bangert asserts that the verdicts "show the jury did not award interest." Bangert's Amended Opening Br. at 80. More specifically, Bangert notes that it asked the jury to award approximately $14.7 million in total damages from all defendants, and the jury responded by awarding total damages of $14,556,240. Id. Finally, Bangert argues that the district court was required under Colorado law to award the full amount of prejudgment interest even if some evidence of prejudgment interest was presented to the jury. Id.

Reviewing the issue de novo, we conclude the district court erred in presuming that the jury's verdict necessarily included an award of prejudgment interest. Although one of Bangert's exhibits referred to interest on damages, Bangert's damage experts did not discuss that element of damages in their testimony, nor did Bangert's counsel ask for an award of interest during closing arguments. Indeed, as noted above, Meridian's counsel stated to the jury during closing argument, without objection from Bangert's counsel, that the interest computations on Exhibit 583A had been stricken and were no longer to be considered by the jury. Further, the jury instructions were silent with respect to the issue of prejudgment interest and there was nothing in the instructions to require the jury to include an interest component in its damage award. Finally, nothing about the amount of damages awarded by the jury necessarily indicates that the jury included prejudgment interest in its award. Considered together, these factors clearly weigh

against any presumption that the jury included prejudgment interest in its damage award. See Gierlinger v. Gleason, 160 F.3d 858, 874-75 (2d Cir. 1998) (rejecting district court's presumption that jury's award included prejudgment interest where, in pertinent part, the jury instructions made no mention of prejudgment interest); H.H. Robertson Co. v. V.S. DiCarlo General Contractors, Inc., 950 F.2d 572, 579 (8th Cir. 1991) (refusing to conclude jury's general verdict included award of prejudgment interest where jury instructions did not specifically direct the jury to award interest); California & Hawaiian Sugar Co. v. Kansas City Terminal Warehouse Co., 788 F.2d 1331, 1334 (8th Cir. 1986) (refusing to conclude jury included award of prejudgment interest in its general verdict, even though plaintiff's damages chart included prejudgment interest figures and plaintiff requested prejudgment interest during closing arguments, because no instruction had been given on the issue of prejudgment interest); People v. Dunlap, 975 P.2d 723, 744 (Colo. 1999) (under Colorado law, reviewing court presumes the jury understood and heeded instructions).

In light of this conclusion, we reverse the prejudgment interest award in favor of Bangert and against Meridian, and remand with instructions to the district court to award prejudgment interest in favor of Bangert accruing from January 1, 1994.

*Meridian's quantum meruit claim*

Bangert contends the district court erred in entering judgment in favor of Meridian

on its quantum meruit counterclaim against Bangert. In support of its contention, Bangert asserts that its Seventh Amendment rights were violated by the district court's findings and conclusions on Meridian's quantum meruit claim. According to Bangert, the district court's findings with regard to the quantum meruit claim conflict with the jury's implicit findings on the CPWA claim.[11]

In Skinner v. Total Petroleum, Inc., 859 F.2d 1439, 1442-43 (10th Cir. 1988), we outlined the protections afforded by the Seventh Amendment:

> The Seventh Amendment protects a party's right to a jury trial by ensuring that factual determinations made by a jury are not thereafter set aside by the court, except as permitted under the common law. . . . Thus, under the Seventh Amendment, the court may not substitute its judgment of the facts for that of the jury; it may only grant a new trial if it concludes that the jury's verdict was so against the weight of the evidence as to be unsupportable.
> The strictures of the Seventh Amendment are particularly applicable in a case where, due to the presence of both equitable and legal issues, trial is both to the jury and to the court. In such a situation, when a case involves both a jury trial and a bench trial, any essential factual issues which are central to both must be first tried to the jury, so that the litigants' Seventh Amendment jury trial rights are not foreclosed on common factual issues. Moreover, the court is bound by the jury's determination of factual issues common to both the legal and equitable claims.

(Internal citations omitted.)

In order to preserve Bangert's Seventh Amendment rights, we must treat the jury's

_____

[11] Bangert also argues that neither the evidence in the record nor the district court's findings of fact support a claim for unjust enrichment under Colorado law. We find it unnecessary to address this argument since we agree with Bangert that the district court's judgment on the quantum meruit claim is inconsistent with the jury's verdict on the CPWA claim.

verdict on Meridian's CPWA counterclaim (which verdict the district court allowed to stand) "as binding under collateral estoppel or issue preclusion principles." Ag Serv. of America, Inc. v. Nielsen, 231 F.3d 726, 731 (10th Cir. 2000). To do so, we "must consider what findings are explicit or necessarily implied by the verdict, including examining alternative bases by which the jury could have reached its conclusion." Id. We need not "determine the precise basis of the jury verdict." Id. "Instead, we examine the possible inferences from the verdict against the findings and conclusions made by the district [court] on the equitable claims." Id. at 731-32. Issue preclusion will apply if "the jury verdict by necessary implication reflects the resolution of a common factual issue." Id. at 732.

The jury was instructed that, in order to find for Meridian on its CPWA claim, Meridian had to prove beyond a preponderance of the evidence that: (1) "Meridian supplied materials used in the prosecution of the work on Project F-111B," (2) "[n]either Bangert nor any other party made full payment to Meridian for the materials supplied," and (3) "[t]he monies claimed by Meridian [we]re lawfully due to Meridian." Joint App. at 7812. Because the verdict form on the CPWA claim was a general one, simply asking the jury whether or not it found in favor of Meridian and against Bangert on the CPWA claim, there were no express jury findings with regard to these three essential elements. Meridian suggests it is possible that the jury found against it on any or all of the three essential elements; thus, Meridian asserts that the jury's general verdict on the CPWA

-38-

claim does not necessarily imply any specific findings on any of the three elements. In contrast, Bangert asserts it "was undisputed that Meridian supplied sand and rock that was used in the prosecution of the work on F-111B," and therefore "[t]he only question for the jury was whether, based on monies already paid to Meridian, there was any balance due for materials that were used in the prosecution of the work." Bangert's Amended Response Br. at 83. Accordingly, Bangert asserts, it was inconsistent for the district court to find that Bangert received a benefit at Meridian's expense since the jury necessarily concluded that Meridian had received full payment for the materials it supplied for the project.

To resolve the issue, we turn to the record on appeal. The central point of dispute between Meridian and Bangert at trial (with respect to Meridian's counterclaims) was the amount of materials (i.e., sand and rock) actually supplied by Meridian to the project. Meridian asserted that it had not been paid fully for all materials it shipped to the project site. In support of its assertion, Meridian relied on its shipping and billing records, which it argued were reliable and trustworthy. Meridian also asserted (without dispute from Bangert) that it was unnecessary for it to demonstrate that the materials it allegedly delivered to the project site were actually incorporated into the concrete runway (as opposed to being wasted by Bangert/CSI/Kiewit or used for other purposes on the job site). Tr. at 7492.

Bangert's position was that it had paid Meridian fully for materials actually

supplied to the project. More specifically, Bangert asserted that Meridian's

shipping/billing records were flawed, and that at least some of the materials for which

Meridian sought payment actually were used on another runway project at DIA with

which it had no involvement. Consistent with this position, Bangert's counsel made the

following statements to the jury during closing arguments:

> Meridian is pursuing Bangert under the Public Works Act, and under the
> Public Works Act you have to show that the materials were used in the
> prosecution of the work. . . . The point is, they [Meridian] had to show, and
> they didn't show, that those materials [i.e., the sand and rock for which
> Meridian sought payment] were used in the prosecution of the work. And
> that's the quantity dispute, ladies and gentlemen.

Tr. at 7566 (rebuttal argument from Bangert's counsel). In addition, Bangert's counsel

stated to the jury: "[W]e believe Meridian has substantially overbilled for the rock that

they allege was used on the job." Id. at 7568.

Given the parties' positions, as well as the evidence presented by the parties to

support their respective positions, it is apparent that the jury's resolution of Meridian's

CPWA claim rested on the second element of the claim. In short, the only issue of

dispute was whether Meridian had been paid fully for the materials it actually supplied for

the F-111B project.[12] In finding in favor of Bangert and against Meridian on the CPWA

claim, the jury necessarily had to find that Meridian's shipping/billing records were

---

[12] The first element was not at issue since it was uncontroverted that Meridian
supplied some materials that were used by Bangert in the project. Further, there was no
factual dispute regarding the third element.

flawed and that it had been paid fully by Bangert for all materials it actually shipped to the site. In other words, the jury chose to believe the evidence presented by Bangert regarding the amount of materials actually provided by Meridian for the project (as opposed to Meridian's evidence on that point).

The question then becomes whether the jury's factual finding on this point precluded the district court from finding in favor of Meridian on its quantum meruit claim. Under Colorado law, a plaintiff seeking to recover under a theory of quantum meruit, or unjust enrichment, must establish that "(1) at plaintiff's expense (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying." Salzman v. Bachrach, 996 P.2d 1263, 1265-66 (Colo. 2000). In finding in favor of Meridian on its quantum meruit claim, the district court found that Bangert retained and used materials supplied by Meridian without paying for them. Joint App. at 4114. Clearly, these findings are inconsistent with the jury's findings on the CPWA claim. More specifically, by finding in favor of Bangert and against Meridian on the CPWA claim, the jury necessarily had to have found that Meridian had been paid fully for the materials it actually supplied for use on the F-111B project. Given that finding, it was inconsistent for the district court to find that Bangert received a benefit at Meridian's expense. We conclude the district court's judgment in favor of Meridian on the quantum meruit claim must be set aside under principles of issue preclusion, as well as to preserve Bangert's Seventh Amendment rights.

-41-

III.

With respect to Empire's appeal (Case No. 00-1024), we AFFIRM the judgment as a matter of law in favor of CSI on its fraudulent misrepresentation claim, but REVERSE the damage award in favor of CSI on its fraudulent misrepresentation claim and REMAND to the district court for further proceedings consistent with this order. With respect to Meridian's appeal (Case No. 00-1029), we AFFIRM the judgment of the district court. With respect to Bangert's appeal (Case No. 00-1036), we REVERSE the district court's prejudgment interest award in favor of Bangert on its claim against Meridian and REMAND with directions to the district court to award prejudgment interest in favor of Bangert on that claim from January 1, 1994, to the date of the original judgment. We also REVERSE the judgment of the district court in favor of Meridian on its quantum meruit counterclaim against Bangert.