**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ZIA SHADOWS, L.L.C., a New Mexico
limited liability company; ALEX GARTH;
WILLIAM GARTH,

     Plaintiffs - Appellants,

v.

CITY OF LAS CRUCES, a municipal
corporation,

     Defendant - Appellee.

No. 15-2009

_____

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. 2:09-CV-00909-WPL-SMV)**
_____

Cindy Rhodes Victor, Kus Ryan & Associates, PLLC, Auburn Hills, Michigan, for
Plaintiffs-Appellants.

David P. Lutz (William L. Lutz with him on the briefs), Martin, Lutz, Roggow &
Eubanks, P.C., Las Cruces, New Mexico, for Defendant-Appellee.
_____

Before **BRISCOE**, **McKAY**, and **McHUGH**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

# I.  INTRODUCTION

This appeal arises from a zoning dispute between Zia Shadows L.L.C and the City of Las Cruces (the City). Zia Shadows L.L.C. and its principals, Alex and William Garth (collectively, Zia Shadows), filed suit in federal district court, alleging the City's delays in approval of a zoning request—and the conditions ultimately attached to the approval—violated Zia Shadows' rights to due process and equal protection. Zia Shadows also alleged the City's actions were taken in retaliation for Zia Shadows' public criticisms of the City. The district court granted summary judgment to the City on Zia Shadows' due-process and equal-protection claims, and a jury found in favor of the City on Zia Shadows' First Amendment retaliation claim.

Zia Shadows now argues the district court erred in granting summary judgment, the district court abused its discretion both in its instruction of the jury and its refusal to strike a juror, and the jury's verdict is against the clear weight of the evidence. We affirm the district court's judgment, concluding Zia Shadows failed to establish the requisite elements of its due-process and equal-protection claims and has not demonstrated reversible error in either the proceedings or verdict at trial.

# II.  BACKGROUND

Zia Shadows operated a mobile-home park in Las Cruces, New Mexico, under a special-use permit from the City. In late 2000, a dispute over water-rights fees arose between Zia Shadows and the City, and Alex Garth protested these fees and lodged written and oral complaints with the City Council. In December 2002, the City informed Zia Shadows that, under a new zoning code adopted in 2001, Zia

2

Shadows was required to enter into an approved compliance plan with the City before it could replace or add new mobile homes in the park. In March 2003, Zia Shadows submitted a proposed compliance plan, seeking to convert its park to a Planned Unit Development (PUD), which would excuse Zia Shadows from compliance with certain land-use requirements.

The City's Planning and Zoning Commission recommended approval of Zia Shadows' PUD application, but the City Council questioned whether Zia Shadows provided a public benefit to offset the zoning variances it sought, as required by the PUD ordinances. The City expressed some willingness to approve the project if Zia Shadows helped to pay the cost of widening the adjacent public roadway, or if Zia Shadows could demonstrate it was providing affordable housing as defined by the U.S. Department of Housing and Urban Development. In August 2003, Zia Shadows agreed to table its PUD application and to work with City staff to meet the City's requirements.

In November 2004, Zia Shadows filed for bankruptcy to avoid foreclosure on its property. Although Zia Shadows subsequently agreed to provide a public benefit by paying for a portion of the road-widening project, the City expressed concern that Zia Shadows would be unable to satisfy its obligations due to its bankruptcy. Approval of Zia Shadows' PUD application was therefore delayed until it could obtain a bond to cover its obligations. The City ultimately approved the PUD application in June 2006, subject to final plat approval and an agreement on the

3

public-roadway improvements. But Zia Shadows' lender foreclosed on the property, and the property was sold in September 2006.

Zia Shadows filed suit against the City in New Mexico state court, seeking relief under 42 U.S.C. § 1983 for violation of its due-process, equal-protection, and First Amendment rights. The City timely removed the action to federal court. The City then sought summary judgment on all of Zia Shadows' claims. The district court granted summary judgment on Zia Shadows' due-process and equal-protection claims, but concluded that material factual disputes rendered summary judgment on Zia Shadows' First Amendment retaliation claim inappropriate. The parties tried that claim before a jury, which returned a verdict in favor of the City. Zia Shadows then filed a motion for a new trial; the district court denied the motion. Zia Shadows now appeals.

## III.  ANALYSIS

Zia Shadows asserts four errors in the district court proceedings. First, it contests the summary judgment rulings on its due-process and equal-protection claims. Second, Zia Shadows claims it was prejudiced by a last-minute change to the jury instructions. Third, it requests a new trial because the district court allowed a City employee to sit on the jury. Fourth, Zia Shadows argues the jury's verdict on its retaliation claim was against the clear weight of the evidence.

***A. The District Court Did Not Err in Granting Summary Judgment on Zia Shadows'***
***Due-Process and Equal-Protection Claims.***

We first consider Zia Shadows' challenges to the district court's summary

judgment rulings on Zia Shadows' due-process and equal-protection claims. "We

review the grant of summary judgment de novo applying the same standard as the

district court embodied in Rule 56(c)." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664,

670 (10th Cir. 1998). "In applying this standard, we view the factual record and draw

all reasonable inferences therefrom most favorably to the nonmovant." *Id.* Summary

judgment is proper "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a).

**1. Due Process**

To prevail on a due-process claim under § 1983, "a plaintiff must first

establish that a defendant's actions deprived plaintiff of a protectable property

interest." *Nichols v. Bd. of Cty. Comm'rs*, 506 F.3d 962, 969 (10th Cir. 2007). A

property interest exists in the constitutional sense where a litigant can demonstrate a

"legitimate claim of entitlement" to the claimed benefit. *Hyde Park Co. v. Santa Fe*

*City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000). In the municipal land-use

context—where the asserted property interest is a right to particular action or inaction

by city zoning authorities—our analysis of the litigant's entitlement focuses on the

level of discretion allowed to the zoning authority under the applicable state and local

zoning laws. *Id.* A legitimate claim of entitlement to a particular land-use decision

5

exists only when that decision is legally mandatory: where the land-use authority's "discretion is limited by the procedures in question," and those procedures, "if followed, require a particular outcome." *Nichols*, 506 F.3d at 970. But "where the governing body retains discretion and the outcome of the proceeding is not determined by the particular procedure at issue, no property interest is implicated." *Id.* The litigant asserting a property interest in a particular zoning decision bears the burden to "demonstrate that a set of conditions exist under state and local law" that so limit the land-use authority's discretion as to make the decision legally mandatory. *Hyde Park*, 226 F.3d at 1210.

In support of its due-process claim, Zia Shadows asserts a protectable property interest in its special-use permit to operate as a mobile-home park and in the approval of its PUD application. Thus, to prevail, Zia Shadows must show that under state or local law, the City was required to leave Zia Shadows' special-use permit intact or to grant its PUD application more promptly and without the conditions to which Zia Shadows objects.

a. *Special-Use Permit*

As to the special-use permit, Zia Shadows has not even attempted to meet its burden; it merely asserts it had been granted a permit and was in compliance with the permit's conditions. This assertion may well be true, but it misses the crucial point: whether the City had discretion to modify or revoke the permit through subsequent zoning amendments. The district court concluded the City did have such discretion, noting that Zia Shadows had not cited a single authority to the contrary. And Zia

6

Shadows has failed on appeal to direct this court to any authority limiting the City's discretion to revoke or modify a special-use permit. Because Zia Shadows has failed to meet its burden to show a legitimate claim of entitlement to the continued validity of its special-use permit, we agree with the district court that Zia Shadows had no constitutionally protected property interest in that permit.

### b. PUD Application

With respect to approval of its PUD application, Zia Shadows relies on the municipal ordinance that requires nonconforming mobile-home parks to seek approval of a zoning compliance plan. This ordinance provides that a PUD "may satisfy the compliance plan requirement" and requires any compliance plan to be "approved, approved with conditions, or denied by the Community Development Department." Las Cruces, N.M., Code § 38-73(B)(3)(c).[1] Because nothing in this section requires further review by other City departments or the City Council, Zia Shadows contends the Community Development Department's approval alone vested Zia Shadows with a legitimate expectation of—and therefore a legal entitlement to—the approval of its PUD application without further review or conditions. Thus, in Zia Shadows' view, the City Council lacked discretion, or even authority, to delay, deny, or attach additional conditions to the approval of Zia Shadows' PUD application once the Community Development Department had approved it as a compliance plan.

---

[1] All citations to the Las Cruces municipal code are to the 2001 zoning code in effect at the time of the dispute, which was supplied by the parties in the district court record.

7

Zia Shadows' argument assumes, however, that section 38-73 marks the beginning and end of the ordinances governing its PUD application. But section 38-73 by its terms addresses only the procedure by which the Community Development Department is to review a mobile-home park's proposed compliance plan—whether that plan relies on a PUD, special-use permit, or other variance—and says nothing about the procedure by which the underlying PUD application is to be considered. Rather, as the district court observed, section 38-49 of the Las Cruces municipal code establishes the process and standards for approval of a PUD application. And section 38-49 explicitly gives the City Council final approval authority over the "Concept Plan" for a PUD—the document which "forms the basis for approval of the PUD"—and gives the Planning and Zoning Commission or the City Council final approval authority over the final site plan. Las Cruces, N.M., Code § 38-49(D)(a).

Here, because Zia Shadows sought approval of both the concept plan and final site plan together in its PUD application, final approval for both plans rested exclusively with the City Council.[2] *See* Las Cruces, N.M., Code § 38-49(D)(d)(1)(a)

---

[2] Zia Shadows contends that it had not submitted a "site plan application" and therefore the Planning and Zoning Commission, rather than the City Council, retained authority over its PUD application. But in its summary-judgment briefing and a supporting affidavit from Alex Garth, Zia Shadows specifically represented to the district court that it had submitted a "proposal for a PUD, a PUD Concept and site plan for approval by the City." And this representation was further supported by the Community Development Director's letter recommending approval of the PUD—also attached to Zia Shadows' summary judgment briefing—stating that Zia Shadows had requested "PUD Concept and Final Site Plan approval." Zia Shadows now attempts to controvert its own factual assertions, pointing to trial testimony from City witnesses regarding the form and content of the application. But our review of a summary-judgment ruling is limited to the record before the district court and the

8

(providing that where "a Final Site Plan has been submitted along with the Concept Plan," the final site plans "shall be submitted along with the Concept Plan to the City Council for final consideration"). The Community Development Department, by contrast, had authority only to provide a nonbinding recommendation on the disposition of the PUD application. *Id.* § 38-49(D)(a), (D)(c)(1). Thus, while section 38-73 vested the Community Development Department with the authority to determine whether the PUD would satisfy Zia Shadows' compliance plan requirement, section 38-49 vested the City Council with the authority to determine if the PUD application should be granted.

Further, our review of section 38-49 demonstrates that the City has significant discretion in approving, denying, or modifying a PUD application. At the outset, section 38-49 states that a PUD "is a zoning district change and is not permitted by right in any zoning district." *Id.* § 38-49(D)(a). It provides that a PUD "may be approved" only if the City makes a number of subjective findings, including that the PUD "conforms to the intent, goals, objectives, policies, and standards of all City plans and codes" and that the proposed uses are "appropriate to the character of the neighborhood and will have a positive aesthetic effect on the neighborhood in which the PUD will be located." *Id.* § 38-49(D)(c)(2). Last, this section directs that "the City Council may impose conditions and require compliance with such other

---

materials brought to the district court's attention by the parties. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). We therefore may not consider the trial testimony Zia Shadows has identified on appeal, and Zia Shadows is bound to the factual representations made in its summary-judgment briefing.

9

standards as deemed necessary," that "[f]inal approval may be granted subject to compliance with such conditions," and that any such conditions "shall be made part of the terms under which the PUD is granted." *Id.* § 38-49(C), (D)(c)(2) (setting forth procedures for review of a concept plan); *see also id.* § 38-49(D)(d)(1) (providing that, with some exceptions, "[t]he review procedures for the Final Site Plan shall be the same as for the Concept Plan"). The broad discretion afforded the City by this ordinance forecloses Zia Shadows' claim of entitlement to approval of its PUD application.[3] Zia Shadows therefore lacked a protectable property interest in the timely and unconditional approval of that application.

Zia Shadows has failed to demonstrate that it had a constitutionally protectable property interest in either its special-use permit or the approval of its PUD application. As a result, Zia Shadows due-process claim fails because it cannot demonstrate the City deprived it of such an interest. We therefore affirm the district court's grant of summary judgment to the City on Zia Shadows' due-process claim.

## 2. Equal Protection

We next consider Zia Shadows' equal-protection claim. "Equal protection jurisprudence has traditionally been concerned with governmental action that disproportionally burdens certain classes of citizens." *Kan. Penn Gaming, LLC v.*

_____

[3] In its reply brief, Zia Shadows argues that if the City does in fact have this degree of discretion, then its zoning laws are unconstitutionally vague. But arguments not raised in the opening brief are waived, *City of Colo. Springs v. Solis*, 589 F.3d 1121, 1135 n.5 (10th Cir. 2009), and we therefore do not generally consider issues raised for the first time in a reply brief, *Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011). Because Zia Shadows did not challenge the Las Cruces municipal code for vagueness in its opening brief, that challenge is waived.

10

*Collins*, 656 F.3d 1210, 1215–16 (10th Cir. 2011). Zia Shadows does not, however, allege discrimination based on membership in any protected class; instead, it claims the City intentionally treated it differently from similarly situated mobile-home parks without any rational basis for doing so. This sort of equal-protection claim is commonly called a "class of one" claim. *Id.* at 1216 (10th Cir. 2011) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam)). "The paradigmatic 'class of one' case, . . . is one in which a public official, with no conceivable basis for his action other than spite or some other improper motive (improper because unrelated to his public duties), comes down hard on a hapless private citizen." *Id.* Such claims are difficult to prove, as the plaintiff bears a "substantial burden" to show that "others similarly situated in all material respects were treated differently and that there is no objectively reasonable basis for the defendant's action." *Id.* at 1217 (internal quotation marks omitted). "It is therefore imperative for the class-of-one plaintiff to provide a specific and detailed account of the nature of the preferred treatment of the favored class." *Jennings v. City of Stillwater*, 383 F.3d 1199, 1214 (10th Cir. 2004).

Zia Shadows identifies three areas in which it believes it was treated differently from other mobile-home parks: first, that Zia Shadows was the only mobile-home park that was required to comply with the new zoning ordinance; second, that Zia Shadows' PUD application was subjected to greater financial scrutiny and conditions on approval of its PUD than other applicants; and third, that

11

the new owner of the mobile-home park previously operated by Zia Shadows has not been required to comply with the requirements the City imposed on Zia Shadows.

Zia Shadows' first two theories fail because the crux of those arguments is that the City failed to demonstrate that others were subjected to the same requirements as Zia Shadows. Zia Shadows argues that "the City's witnesses could not identify a single mobile home park that had come into compliance with the new Zoning Ordinance" and "[t]he City cannot point to any other [PUD] applicant who was treated as were appellants." With these arguments, Zia Shadows attempts to put the burden on the City to prove its actions were legitimate. But in a class-of-one case, the burden lies not on the government defendant but on the plaintiff, who must prove actual differential treatment in materially similar situations. *Jennings*, 383 F.3d at 1215. Zia Shadows has not cited any evidence to show it was similarly situated to any mobile-home parks that were not required to comply with the new zoning ordinances. Nor has Zia Shadows identified any evidence showing that similarly situated PUD applicants received more favorable treatment and were not subjected to a similar level of financial scrutiny.[4] Because Zia Shadows has not met its burden to show actual differential treatment in materially similar situations, the district court properly rejected these aspects of Zia Shadows' class-of-one claim.

---

[4] To support its claim that no other PUD applicant was required to disclose financial information, Zia Shadows cited below and on appeal to deposition testimony from a City employee. But Zia Shadows failed to include the relevant pages of the transcript with its summary-judgment briefing. That portion of the transcript is therefore not in the summary-judgment record, and we cannot consider it on appeal.

Zia Shadows comes closest to meeting its burden on its third theory: that it was treated worse than the current owners of its property, whose situation presumably resembles Zia Shadows' in many ways. However, its assertion appears to rest entirely on the following two paragraphs from an affidavit[5] by Zia Shadows' owner, Alex Garth:

> 31. The current proprietor of the Property has not had to comply with any of the requirements which the City imposed on plaintiffs in this case.

> 32. For example, the current proprietor of the Property keeps the South gates locked, which I was required to keep open so that emergency vehicles could have access to the Property. The current proprietor of the Property also is allowed to place metal (reflective) roofs and/or metal sided mobile homes on the Property without having to obtain a change in zoning or a variance.

This evidence is inadequate to support a class-of-one claim because it fails to meaningfully address the City's actions or the reasons for the City's differential treatment. To prevail, Zia Shadows must show both that it was treated differently and that the City has no objectively reasonable basis for its actions under the circumstances. *Kan. Penn Gaming*, 656 F.3d at 1217. While Mr. Garth avers that the current proprietor "keeps the South gates locked" and "is allowed to" have mobile homes with metal sides or roofs, it is unclear whether he is asserting the City explicitly gave the new owner permission it had denied Zia Shadows, or merely that the new owner has not been punished for flouting the rules. And even if we assume the City affirmatively gave such permission to the new

---

[5] In its appellate briefs, Zia Shadows cited to trial testimony in support of this argument. Because that evidence was not before the district court when it granted summary judgment, it is not relevant to our decision here. We instead consider only the evidence put forth by Zia Shadows in its summary-judgment briefing.

owner, Zia Shadows has put forth no evidence regarding the circumstances under which such permission was given. Without some evidence on this point, there is no way to evaluate the reasonableness of the City's actions. The absence of such evidence is fatal to Zia Shadows' claim of disparate treatment under a class-of-one theory, and the district court properly granted summary judgment to the City.

### B. The District Court Did Not Abuse Its Discretion in Modifying the Retaliation Instruction After the Close of Evidence.

With respect to the trial on its retaliation claim, Zia Shadows first argues that the district court erred by modifying the jury instruction on Zia Shadows' First Amendment retaliation claim after the close of evidence. "We review a district court's decision to give a particular jury instruction for abuse of discretion, but we review de novo legal objections to the jury instructions." *Lederman v. Frontier Fire Prot., Inc.*, 685 F.3d 1151, 1154 (10th Cir. 2012) (internal quotation marks omitted). An instructional error mandates reversal, however, "only if the error is determined to have been prejudicial, based on a review of the record as a whole." *Sherouse v. Ratchner*, 573 F.3d 1055, 1059 (10th Cir. 2009).

Before the trial, the parties sought to finalize the jury instruction explaining the elements of Zia Shadows' retaliation claim. Zia Shadows proposed an instruction, modeled after our decision in *Worrell v. Henry*, 219 F.3d 1197 (10th Cir. 2000), that included the following element: "To prevail on a claim for retaliation for exercise of First Amendment rights, plaintiffs must prove that . . . adverse action was taken against them which would deter a person of ordinary firmness from continuing to

14

engage in [constitutionally protected] conduct." The City objected to this version of the instruction and proposed a new version requiring only that "the Defendant took action against the plaintiff"—not that the action taken "would deter a person of ordinary firmness." The parties eventually stipulated to the City's version of the instruction and submitted it to the court.

After the close of evidence, the City changed its mind. The City argued, in effect, that Zia Shadows' original statement of the law had been correct. It asked the court to replace the stipulated language with a requirement that the City's action against Zia Shadows "would chill the person [of ordinary] firmness from continuing to engage in [constitutionally protected] activity."

Zia Shadows objected. It pointed out that the erroneous instruction was the City's idea and that the City had stipulated to it. Zia Shadows further claimed it had presented its case on the assumption that it would not have to prove any chilling effect: "So all along I've relied on [the City's stipulation] in my questioning . . . . And so now I'm in a situation where I can see the defendant saying, you never heard any testimony about chilling ordinary firmness . . . ." Zia Shadows accordingly argued the district court should leave the stipulated instruction in place or, at a minimum, prohibit the City from taking advantage of the new instruction in its closing argument. The district court overruled Zia Shadows' objections, and the City briefly contended in closing argument that the City's actions would not have "chill[ed] a person of ordinary firmness."

15

While this sequence of events is unusual, we see no grounds for reversal. Zia Shadows has not challenged the district court's ruling permitting the City to argue a lack of chilling effect in closing. Rather, Zia Shadows challenges only the district court's decision to give the instruction containing that requirement. And Zia Shadows does not claim the instruction, as given, was legally incorrect. Indeed, the law in this circuit is clear: a First Amendment retaliation claim requires a showing that the defendant's actions "caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in [constitutionally protected] activity." *Worrell*, 219 F.3d at 1212 (internal quotation marks omitted).

Instead, Zia Shadows relies on two procedural arguments: first, the district court should have enforced the City's stipulation; and second, the district court should not have allowed the City to change its legal position after the close of evidence. Neither argument has merit.

With respect to the first argument, we cannot agree the district court was required to enforce the City's stipulation on the elements of Zia Shadows' retaliation claim. "[I]t is well-settled that a court is not bound by stipulations of the parties as to questions of law." *Koch v. U.S., Dep't of Interior*, 47 F.3d 1015, 1018 (10th Cir. 1995) (quoting *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1477 n.1 (9th Cir. 1986)). The jury instructions on the elements of a claim are a statement of the law, and mandating that a court enforce a stipulation to an erroneous or incomplete jury instruction would effectively require the court to commit legal error. The case law Zia Shadows relies on says nothing to the contrary—rather than requiring trial courts

16

to honor stipulations of law, it holds merely that a party, having stipulated to a particular jury instruction at trial, may not challenge that instruction *on appeal*. *EarthGrains Baking Cos. v. Sycamore Family Bakery, Inc.*, 573 F. App'x 676, 681 (10th Cir. 2014) (unpublished). The district court was therefore not bound by the City's stipulation to the original jury instruction. Instead, it was obligated to correctly instruct the jury on the law.

Zia Shadows' second argument is that the City should not have been allowed to change its position after Zia Shadows had relied on it. But the legal basis for this argument is murky. Zia Shadows' brief claims that the City "did not timely object to the jury instruction," but that is not correct. The City objected precisely when the rules required: at the hearing where the court "must give the parties an opportunity to object on the record and out of the jury's hearing before the instructions and [closing] arguments are delivered." Fed. R. Civ. P. 51(b)(2); *id.* 51(c)(2) (providing that an objection raised at that time "is timely"). And while Zia Shadows contended at oral argument that this claim could be framed in terms of estoppel, it is not clear what species of estoppel—if any—might apply in this situation.

Regardless of its legal theory, Zia Shadows must show prejudice to justify reversal on the basis of an instructional error. *Sherouse*, 573 F.3d at 1059. And it has failed to do so here. Zia Shadows' only effort to show the requisite harm is its assertion that, had it known it would need to demonstrate a chilling effect, it would have "prosecuted [its] case differently by asking different questions that addressed the elements of a First Amendment retaliation claim set forth in the jury instruction."

17

But Zia Shadows does not say what sort of testimony it would have elicited, or from whom. Moreover, because the jury was to consider the chilling effect of the City's actions by an objective standard—that is, whether the City's action would chill a person of ordinary firmness, not whether it, in fact, chilled the plaintiffs' conduct—it is unclear what additional testimony Zia Shadows could have elicited to establish this element. Zia Shadows' failure to demonstrate prejudice is fatal to this claim.

The district court was not bound by the City's stipulation to an erroneous jury instruction, and Zia Shadows has failed to demonstrate prejudice stemming from the district court's correction of the jury instruction after the close of evidence. We therefore conclude the district court did not abuse its discretion in instructing the jury, and Zia Shadows is not entitled to a new trial on this basis.

## C. The District Court Did Not Err in Refusing to Strike a City Employee From the Jury.

Zia Shadows' most challenging argument is that a City employee who sat on the jury should have been deemed impliedly biased and struck for cause. Generally, we review a district court's refusal to strike a juror for cause under an abuse-of-discretion standard, as "the district court is in the best position to observe the juror and to make a first-hand evaluation of his ability to fair." *Getter v. Wal-Mart Stores, Inc.*, 66 F.3d 1119, 1122 (10th Cir. 1995). We therefore afford great deference to a district court's judgment in evaluating a juror's actual bias, as that judgment must be "based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." *United States v. Powell*, 226 F.3d 1181, 1188 (10th Cir.

18

2000). Whether a juror's bias should be implied from the circumstances is, conversely, a legal question, "dependent on an objective evaluation of the challenged juror's experiences and their relation to the case being tried." *Id.* (citation and internal quotation marks omitted); *accord Burton v. Johnson*, 948 F.2d 1150, 1158 (10th Cir. 1991) ("Whether a juror's bias may be implied from the circumstances is a question of law for this court."). We accordingly review de novo the question of implied bias. *Powell*, 226 F.3d at 1188. Once a juror is found to be actually or impliedly biased, the district court abuses its discretion if it denies a challenge to that juror for cause.[6] *Getter*, 66 F.3d at 1122.

Zia Shadows argues that juror #8 (the Juror) should have been struck from the jury because he is a City employee. After the jury was empaneled, Zia Shadows moved to strike the Juror for cause, arguing "it would be difficult for him to rule against his employer. He may have repercussions at the job later." The district court denied Zia Shadows' for-cause challenge. Zia Shadows argues the district court abused its discretion in refusing to strike the Juror for implied bias.[7]

---

[6] Some of our cases have been less than meticulous in articulating the standard of review on the specific issue of implied bias. However, to the extent later cases suggest something less than de novo review on this issue, they must yield to *Burton v. Johnson*, 948 F.2d 1150 (10th Cir. 1991), in which this court adopted a standard of de novo review for implied-bias questions that has not been repudiated. *See Hiller v. Okla. ex rel. Used Motor Vehicle & Parts Comm'n*, 327 F.3d 1247, 1251 (10th Cir. 2003) ("To the extent [two panel decisions] are in conflict, . . . we are obligated to follow the earlier panel decision over the later one.").

[7] Because Zia Shadows has not challenged the Juror for actual bias, we do not address that branch of juror bias.

"[A] finding of implied bias is appropriate where the juror, although she believes that she can be impartial, is so closely connected to the circumstances at issue in the trial that bias is presumed." *Powell*, 226 F.3d at 1188 (internal quotation marks omitted). This court has held that the implied-bias doctrine "is not to be lightly invoked, but must be reserved for those extreme and exceptional circumstances that leave serious question whether the trial court subjected [a party] to manifestly unjust procedures resulting in a miscarriage of justice." *Id.* (emphasis omitted). We accordingly require claims of implied bias to meet a "high threshold." *Id.* A litigant can meet this threshold by showing a juror has "a *direct* financial interest in the trial's outcome." *Vasey v. Martin Marietta Corp.*, 29 F.3d 1460, 1468 (10th Cir. 1994). Such a disqualifying interest might exist where "a prospective juror was a stockholder in or an employee of a corporation that was a party to the suit," *Getter*, 66 F.3d at 1122, but we have declined to find such an interest where the financial interest was "more remote," *Vasey*, 29 F.3d at 1468 (holding that district court did not abuse its discretion in declining to excuse for cause a juror who was employed by a company that had a consulting contract with the defendant).

In *Getter v. Wal-Mart Stores, Inc.*, we concluded the district court erred by refusing to excuse a juror who held stock in the defendant corporation and whose wife worked for the defendant. 66 F.3d 1119, 1123 (10th Cir. 1995). We reasoned that "[d]ue to his stock ownership and his wife's employment, [the juror's] financial well-being was to some extent dependent upon [the] defendant's [financial well-being]." *Id.* Accordingly, we held that the relationship between the juror and the defendant

20

was "precisely the type of relationship that requires the district court to presume bias and dismiss the prospective juror for cause." *Id.* However, because the plaintiff used a peremptory challenge to remove the juror, we ultimately concluded the error was harmless. *Id.*

Zia Shadows contends that our decisions in *Getter* and *Vasey* control the outcome here, mandating a conclusion that the Juror was impliedly biased by virtue of his employment with the City. In particular, Zia Shadows relies on the following passage from *Vasey*:

> [C]ourts have presumed bias in extraordinary situations where a prospective juror has had a *direct* financial interest in the trial's outcome, *or where the prospective juror was an employee of a party to a lawsuit*. In these situations, the relationship between the prospective juror and a party to the lawsuit points so sharply to bias in the particular juror that even the juror's own assertions of impartiality must be discounted in ruling on a challenge for cause.

29 F.3d at 1468 (internal quotation marks, brackets, and citations omitted) (second emphasis added). But *Getter* and *Vasey* addressed circumstances under which a juror's relationship to a *private* corporation may give rise to a claim of implied bias. The Juror here, by contrast, was employed by a government entity. And our review of the relevant case law persuades us that there exists no categorical bar on a government employee serving as a juror in a case where the government employer is a party. Thus, irrespective of whether *Vasey* would have mandated disqualification of a privately employed juror under these circumstances, we conclude the district court

21

did not err in declining to disqualify the government-employed juror here for implied bias.[8]

The United States Supreme Court first addressed this issue in the context of a criminal case brought by the federal government in *Crawford v. United States*, 212 U.S. 183 (1909). There, the Supreme Court held that a druggist in the District of Columbia who received compensation from the government for providing postal services—and who was therefore technically a government employee—was disqualified from sitting on the jury in a case brought by the United States for a conspiracy to defraud the government. *Id.* at 192, 196–97. Although the defendant initially sought to disqualify the juror on the basis of a municipal code, the Court looked beyond the statutory claim to consider whether the juror was qualified to serve under the common law. *Id.* at 195. Relying, in part, on Blackstone's Commentaries, the Court concluded that under the common law, "one is not a competent juror in a case if he is master, servant, steward, counselor, or attorney of either party." *Id.* at 195. Applying this rule expansively, the Court held that the district court erred in overruling the defendant's challenge to the juror. *Id.* at 197.

The Supreme Court revisited the issue of government-employee bias in *United States v. Wood*, 299 U.S. 123 (1936). In response to *Crawford*, Congress had enacted a statute explicitly permitting employees of the United States in various capacities to serve as jurors in the District of Columbia. *Id.* at 132–33. The defendant, who had

---

[8] Because the case before us involves only a government employer, we do not address the scope of the implied-bias doctrine as it relates to private employers.

22

been convicted of criminal charges by a jury that included two government employees, argued the statute permitting their service deprived him of his right to an impartial jury under the Sixth Amendment. *Id.* The Court, however, rejected defendant's contention that the Constitution requires "absolute disqualification in criminal cases of a person employed by the government," and it affirmed his conviction. *Id.* at 134, 151.

In reaching its conclusion, the Court first determined "there was no settled practice under the English law establishing an absolute disqualification of governmental employees to serve as jurors in criminal cases," and thus such a practice could not "be treated as embedded in the Sixth Amendment." *Id.* at 137. And with respect to the law as it developed in the colonies, the Court concluded that Blackstone's discussion of the issue was limited to "masters and servants of private parties" and made no mention of "the practice in crown cases with respect to servants of the crown." *Id.* at 138, 139. The Court therefore declined to hold that "the common-law rule was different in the colonies from that in England" or that the Congress and States which proposed and ratified the Sixth Amendment "undertook to establish an absolute disqualification of all governmental employees beyond the control of the congressional power." *Id.* at 139.

The Court also distinguished and called into question the validity of the rule in *Crawford*. *Id.* at 139–41. It observed that the *Crawford* Court "was not aided by a careful or comprehensive presentation of the English precedents" and had relied on Blackstone without recognizing the "rule which had obtained in England with respect

23

to the qualifications of servants of the crown to serve as jurors in crown cases." *Id.* at 140–41. After considering the common-law authorities, the Court concluded there was no "settled rule of the common law prior to the adoption of the Sixth Amendment that the mere fact of a governmental employment, unrelated to the particular issues or circumstances of a criminal prosecution, created an absolute disqualification to serve as a juror in a criminal case." *Id.* at 141. The Court accordingly held it was "unable to accept the ruling in the *Crawford* Case as determinative" with respect to the question of whether government employment mandated such disqualification. *Id.* "The ultimate question," the Court concluded, is whether "an absolute disqualification of governmental employees to serve as jurors in criminal cases is essential to the impartiality of the jury." *Id.* at 147–48. The Court answered that question in the negative, stating "the imputation of bias simply by virtue of governmental employment, without regard to any actual partiality growing out of the nature and circumstances of particular cases, rests on an assumption without any rational foundation."[9] *Id.* at 149.

---

[9] The dissent bases its call for a more expansive view of the implied-bias doctrine, in part, on the "general tendency" of jurors to "look somewhat more favorably . . . upon the side of the person or corporation that employs them." *See Crawford v. United States*, 212 U.S. 183, 196 (1909). And the dissent finds evidence of this "general tendency" in the voir dire transcript in this case. When the district court asked, "[S]ince you work for the City, do you think everything the City does is absolutely correct?" the Juror responded, "Well, it's—being my employers, I would say yes." But the implied-bias doctrine asks whether an average person in the juror's position would be partial, not whether the juror was, in fact, partial to one side. *United States v. Powell*, 226 F.3d 1181, 1188 (10th Cir. 2000). Thus, such testimony betrays, if anything, *actual bias* on the part of the Juror, and the actual-bias inquiry is "based upon determinations of demeanor and credibility that are peculiarly within a

Thus, *Wood* establishes that, as a general rule, government employment carries with it no blanket assumption of implied bias in criminal cases. *See also Baker v. Hudspeth*, 129 F.2d 779, 783 (10th Cir. 1942) ("It is now well established . . . by modern authority that a fair and impartial trial does not necessarily demand the exclusion of governmental employees from [a criminal] jury."). Important to our analysis here, *Wood* also recognized that the common-law rule was the same in criminal and civil actions. 299 U.S. at 138–39, 140. And this court has applied *Wood* in a civil condemnation action brought by the federal government to conclude that a "prospective juror was not disqualified per se, merely because he was a government employee." *United States v. Chapman*, 158 F.2d 417, 419 (10th Cir. 1947); *accord D.C. Transit Sys., Inc. v. Slingland*, 266 F.2d 465, 469 (D.C. Cir. 1959) (holding that *Wood* "must be applied to civil as well as to criminal cases"). *Wood* therefore controls here.

In light of *Wood*, we cannot conclude that government employment, standing alone, bars a prospective juror from serving in a case involving the government employer. But in reaching this conclusion, we by no means hold that a government employee could never be found impliedly biased on the basis of that employment.

---

trial judge's province." *Id.* (quoting *Wainwright v. Witt*, 469 U.S. 412, 428 (1985)). In response to the district court's further questioning on this issue, the Juror stated that he did not think city governments always make correct decisions, that he could be fair to both sides, and that he would not favor the City even in light of Zia Shadows' request for a "large sum" in damages. The district court was apparently satisfied the Juror harbored no actual bias, and Zia Shadows has not raised an actual-bias challenge on appeal. Thus, the Juror's voir dire statements do not meaningfully illuminate the implied-bias issue before us on appeal.

For example, this court has frequently referred to Justice O'Connor's observation that a juror who is "an actual employee of the prosecuting agency" might present the sort of "extreme situation" that would call for an implication of bias. *See, e.g.*, *Skaggs v. Otis Elevator Co.*, 164 F.3d 511, 517 (10th Cir. 1998) (quoting *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring)); *Gonzales v. Thomas*, 99 F.3d 978, 987 (10th Cir. 1996) (same). Such circumstances may also exist where, like in *Crawford*, the potential juror is an employee of the very agency or department whose conduct or interests are at issue in the case. *See* 212 U.S. at 189, 192. Or, through the use of careful follow-up questions, counsel seeking to disqualify a juror may be able to establish actual bias. *See* Ted A. Donner & Richard Gabriel, *Jury Selection Strategy and Science,* § 32.1 (3d ed. 2015–16). The record here, however demonstrates that the Juror maintained City swimming pools—a position completely unrelated to the City's zoning and planning activities at issue in the case. And, as the district court observed, Zia Shadows declined to question the Juror to uncover whether his employment with the City would have any effect on his ability to render an impartial verdict. An implication of bias on the basis of the Juror's government employment alone is therefore not appropriate here.

Zia Shadows does raise one argument that circumstances beyond the Juror's mere employment with the City should result in an implication of bias: it contends the Juror "may have repercussions at the job later" and would "certainly fear that at some point, the City would take retaliatory actions against him." But the Supreme Court in *Wood* rejected as "far-fetched and chimerical" the suggestion that "an

26

employee of the government may be apprehensive of the termination of his employment" in retaliation for deciding a case against his government employer. 299 U.S. at 150. Absent "reference to some special and exceptional case," the Court concluded this theory "belongs in the category of theoretic or imaginary interests— remote and insignificant." 299 U.S. at 150 (internal quotation marks omitted). We therefore cannot agree with Zia Shadows that the Juror should have been disqualified based on a hypothetical fear of retaliation from his government employer.

Ultimately, Zia Shadows has failed to meet the "high threshold" to show that the Juror was "so closely connected to the circumstances at issue in the trial" that we must question the objectivity of a reasonable juror in his situation. *Powell*, 226 F.3d at 1188. The district court therefore did not err in concluding the Juror was not impliedly biased. Absent a showing of bias, the district court did not abuse its discretion in denying Zia Shadows' motion to strike the Juror.

### D. The Jury's Verdict on Zia Shadows' Retaliation Claim Is Not Against the Clear Weight of the Evidence.

Last, Zia Shadows argues it is entitled to a new trial because "the weight of the evidence demonstrates that judgment should have been entered in favor of appellants." When a party challenges the jury's verdict on appeal, "our review is limited to determining whether the record—viewed in the light most favorable to the prevailing party—contains substantial evidence to support the jury's decision." *Bangert Bros. Const. Co. v. Kiewit W. Co.*, 310 F.3d 1278, 1292 (10th Cir. 2002). "Substantial evidence is something less than the weight of the evidence, and is

defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, even if different conclusions also might be supported by the evidence." *Id.* Thus, we may reverse a jury's verdict only "if the evidence points but one way and is not susceptible to any reasonable inferences supporting" the verdict. *Abuan v. Level 3 Commc'ns, Inc.*, 353 F.3d 1158, 1168 (10th Cir. 2003).

A plaintiff must prove three elements to establish a First Amendment retaliation claim:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

*Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (internal quotation marks omitted). The district court instructed the jury that Zia Shadows had engaged in constitutionally protected activity and that the first element was therefore proven.

We readily conclude the jury's verdict here was supported by adequate evidence. Zia Shadows' briefing on this issue amounts to a list of supposedly unjustified actions the City took and the supposedly suspicious circumstances in which the City took them. Although Zia Shadows contends "the evidence was overwhelming that the City's actions were motivated by appellants' speech," every point of evidence Zia Shadows cites is susceptible to various interpretations, supporting Zia Shadows' case only if viewed in a very particular light. But the jury was not obliged to view the evidence in that light, and, given our standard of review,

we are required to take a contrary approach of viewing the evidence in the light most favorable to the verdict. *Bangert Bros.*, 310 F.3d at 1292.

Moreover, the evidence Zia Shadows has put forward to show the City's improper motive, if believed, demonstrates that City officials took adverse action against Zia Shadows due to "personal animosity" toward its owners. But Zia Shadows must show more than an improper purpose behind the City's actions; it must show that the City's actions were specifically motivated by Zia Shadows' criticism of the City. *Worrell*, 219 F.3d at 1212. Zia Shadows has identified no "overwhelming" evidence to support such a claim.

It is possible that, in handling Zia Shadows' PUD application, the City violated its own zoning procedures or New Mexico law. It might even be possible, one could imagine, that some nefarious purpose was at work: a personal animus against Zia Shadows' owners or a conspiracy to profit from their financial ruin. But even if all this were true, it does not establish a First Amendment retaliation claim unless the City's acts were substantially motivated by Zia Shadows' protected speech. And on that issue the record evidence in this case does not "point[] but one way" such that a reasonable jury would necessarily find that Zia Shadows' speech substantially motivated the City to act as it did. *Abuan*, 353 F.3d at 1168. Accordingly, we cannot conclude the verdict was contrary to the evidence.

## IV.  CONCLUSION

Zia Shadows failed to demonstrate that the City deprived it of a constitutionally protected property interest or that the City treated Zia Shadows

29

differently from similarly situated mobile-home parks. The district court thus did not err in granting summary judgment to the City on Zia Shadows' due-process and equal-protection claims. Neither did the district court err in instructing the jury or in declining to strike a City employee from the jury on the basis of implied bias. And the jury's verdict against Zia Shadows on its First Amendment retaliation claim is supported by substantial evidence. We accordingly AFFIRM the district court's judgment.

15-2009, *Zia Shadows, LLC v. City of Las Cruces*
**McKAY**, Circuit Judge, dissenting in part:

I join the majority's opinion except as to the city employee's bias. As to that issue, I do not suggest that ruling for Las Cruces violates any binding precedent. Neither this court nor the Supreme Court has decided whether municipal employees may be jurors in cases involving their employers, and, consequently, we have some flexibility to reach an appropriate answer to the question. Nevertheless I respectfully cannot agree with the answer the majority has reached.

I begin my analysis with the traditional common-law rule requiring us to impute bias to the parties' employees. As the Supreme Court has held, this rule does not apply to the employees of the federal government. But the reasons for the traditional rule apply with full force in this case, while none of the Supreme Court's reasons for exempting federal employees have any relevance to municipal corporations like Las Cruces. We should therefore impute bias to Las Cruces' employee and reverse the district court for allowing him to serve on the jury.

## DISCUSSION

In *Crawford v. United States*, the Supreme Court endorsed the ancient common-law rule that "one is not a competent juror in a case if he is master, servant, steward, counselor, or attorney of either party. In such case a juror may be challenged for principal cause as an absolute disqualification of the juror." 212 U.S. 183, 195 (1909)

(citing 3 William Blackstone, Commentaries on the Laws of England 363 (Thomas M.

Cooley & Andrew James DeWitt, eds., 4th ed. 1899)).

As the majority points out, the Supreme Court later acknowledged an exception to

the traditional rule:  at common law, servants of the crown were not categorically

disqualified from serving as jurors in crown cases.  The Supreme Court applied this

exception to "Government employees," but in doing so it did not question the traditional

rule.  *Dennis v. United States*, 339 U.S. 162, 164–67 (1950).  So far as I can tell,

*Crawford* is still good law where the "masters and servants of private parties" are

concerned.  *United States v. Wood*, 299 U.S. 123, 138 (1936).

Certainly the Tenth Circuit has never questioned *Crawford*.  Instead, we have

acknowledged that "courts have presumed bias in extraordinary situations," such as

"where a prospective juror . . . was an employee of a party to a lawsuit.  In these

situations, the relationship between the prospective juror and a party to the lawsuit points

so sharply to bias" that the juror should be disqualified.  *Vasey v. Martin Marietta Corp.*,

29 F.3d 1460, 1468 (10th Cir. 1994) (brackets and citations omitted) (citing *Francone v.

S. Pac. Co.*, 145 F.2d 732, 733 (5th Cir. 1944) (applying the traditional rule)).

Nor should we question *Crawford* now.  Even if we had authority to overturn

Supreme Court precedent, this is not a doctrine whose only justification is that "so it was

laid down in the time of Henry IV."  Oliver Wendell Holmes, Jr., *The Path of the Law*, 10

Harv. L. Rev. 457, 469 (1897).  Instead its purposes remain as vital as they have always

been.  As the *Crawford* Court wrote,

> Modern methods of doing business . . . have not wrought any change in human nature itself, and therefore have not lessened or altered the general tendency among men . . . to look somewhat more favorably . . . upon the side of the person or corporation that employs them, rather than upon the other side.

*Crawford*, 212 U.S. at 196. This "general tendency" was acknowledged in this very case, by the very city employee whose jury service is being challenged:

> THE COURT: . . . [S]ince you work for the City, do you think everything the City does is absolutely correct?

> JUROR: Well, it's -- being my employers, I would say yes.

(Appellants' App. at 250.)

But, important as such general tendencies are, they are not the only reason for the common-law rule. There is also simple self-interest. *Crawford* justified its holding in part by pointing out the consequences the employee–juror might face if his employer lost the case. "[H]is employment was valuable to him," the *Crawford* Court acknowledged, and even if "cessation of that employment would [not] actually follow a verdict, . . . [i]t is enough that it might possibly be the case." *Id.* at 196–97. "[T]he juror ought not to be permitted to occupy a position of that nature" and thus put the trial's fairness—or the juror's livelihood—at risk. *Id* at 197.

Again, the Tenth Circuit has recognized the wisdom of this reasoning. As we wrote in *Vasey v. Martin Marietta Corp.*, "courts have presumed bias in extraordinary situations where a prospective juror has had a *direct* financial interest in the trial's outcome." 29 F.3d at 1468. We applied this principle in *Getter v. Wal-Mart*, where we concluded that a juror was impliedly biased because his "financial well-being was to some extent dependent upon [the] defendant's." *Getter v. Wal-Mart Stores, Inc.*, 66 F.3d

-3-

1119, 1122 (10th Cir. 1995). Such financial dependence, we held, was "precisely the type of relationship that requires the district court to presume bias and dismiss the prospective juror for cause." *Id.*

Admittedly, *Vasey* did not actually involve parties' employees and thus did not actually hold that parties' employees must be disqualified. But *Vasey* plainly assumed that it did not need to make such a holding—that a rule disqualifying parties' employees already existed. It said so explicitly, it cited a case explaining the traditional rule, and it chose not to disqualify a juror in part because, although he had some economic relationship to a party, he was not actually the party's employee. *See Vasey*, 29 F.3d at 1467–68.

Likewise, *Getter* did not involve a party's employee and therefore did not directly hold that parties' employees must be disqualified; rather, *Getter* specifically held only that a particular juror was disqualified because he owned Wal-Mart shares and was married to a Wal-Mart employee. But the whole thrust of *Getter*'s reasoning supports the traditional rule: *Getter* held that the juror needed to be disqualified because his "financial well-being" was "dependent" on Wal-Mart. 66 F.3d at 1122. I believe this reasoning would apply with no less force to a Wal-Mart employee than to the shareholding spouse of a Wal-Mart employee.

Two circuit courts, including this one, have considered whether *Getter* disqualified jurors who were not shareholders but merely employees of a party. *See Hatfield v. Wal-Mart Stores, Inc.*, 335 F. App'x 796, 801–02 (10th Cir. 2009); *Caterpillar, Inc. v. Sturman*

*Indus.*, 387 F.3d 1358, 1372–73 (Fed. Cir. 2004).  Both said yes, and I believe they are right.

Of the two relationships at stake in *Getter*—the juror's shareholding and the employment of the juror's spouse—shareholding gave the juror only the most negligible financial interest in the verdict.  Wal-Mart's total outstanding stock is worth hundreds of billions of dollars.  Even a juror who owned ten million dollars of Wal-Mart shares would bear only a few thousandths of a percent of any verdict against the company.  But a Wal-Mart employee, like the spouse of a Wal-Mart employee, could lose his livelihood if Wal-Mart chose to retaliate.[1]  *Crawford* was right:  no juror should be put in that position.

Turning then to the actual issue before us, I note that this issue—unlike the implied bias of employees of private parties—is open to fair debate.  I ultimately reach a different conclusion than the majority, and I thus respectfully dissent from the majority's holding.

Under our precedents, this case requires us to resolve the following question:  does a municipal employee have more in common with a private employee, who would be disqualified, or with a federal employee, who would not?  Based on my reading of *United States v. Wood*, the case in which the Supreme Court recognized the federal-employee exception, I conclude that municipal employees and federal employees have little in

---

[1] Admittedly, such retaliation may be illegal.  But the distant and uncertain prospect of winning a retaliation suit would be cold comfort to someone facing termination.

common at all. Thus, I conclude that the *Crawford* rule must be applied to municipal employees, disqualifying them from jury service in cases involving their employers.

The *Wood* Court alluded to six reasons for exempting federal employees from the common-law rule. None of them are relevant here.

*1. Common-law tradition.* First, *Wood* relied on a traditional exception to the common-law rule: at common law, "servants of the crown" could be jurors in "crown cases." 299 U.S. at 139. It was only logical to extend this exception to employees of the federal government, since the federal government is the American institution most similar to the British sovereign.

But municipal corporations are not "the crown" and never have been. In Blackstone's day as now, they were merely creatures of the crown—self-governing societies established by a sovereign, but not sovereigns themselves, and lacking any natural claim to the sovereign's special privileges.[2] Thus *Wood*'s historical reasoning, though perfectly sensible as applied to federal employees, has nothing to do with municipal governments.

*2. Difficulty finding jurors.* Second, *Wood* explained the reason behind the traditional exception for "crown servant[s]": "from the extensive variety of the king's connections with his subjects through tenures and offices, if favour to him was to prevail as an exception to a juror, it might lead to an infinitude of objections, and so operate as a

---

[2] According to tradition, the first municipal corporation was created in 1439, when a young Henry VI incorporated Kingston-upon-Hull. 1 Eugene McQuillin, A Treatise on the Law of Municipal Corporations § 51, at 109 (1911).

serious obstruction to justice in suits in which he is a party." *Id.* at 137.[3] *Wood* noted a similar problem in the District of Columbia, where disqualifying federal employees had "narrow[ed] the eligible list of jurors . . . to the point where it sometimes became difficult to secure jurors possessing the necessary qualifications." *Id.* at 133. Allowing federal employees to be jurors served "a public need." *Id.* at 148.

There is no "public need" here. No municipality in this circuit is so large as to employ more than a small fraction of the potential jurors in its district.

*3. Legislative judgment.* Third, *Wood* dealt with an Act of Congress. Because courts were having difficulty finding jurors in the District of Columbia, Congress passed a statute allowing federal employees to serve on D.C. juries even when the federal government was a party. *Id.* at 130–32. This statute, the *Wood* Court wrote, was "tantamount to a legislative declaration that the [disqualification of federal employees] was artificial and not necessary to secure impartiality." *Id.* at 148–49.

No Act of Congress concerns us here. No legislative body has concluded that disqualifying municipal employees is "artificial" or "not necessary to secure impartiality."

*4. Differences between civil and criminal cases.* Fourth, *Wood* was a criminal case and relied in part on differences between criminal and civil cases. The *Wood* Court

---

[3] Here the Supreme Court quotes a comment on Coke's Institutes by Francis Hargrave, who produced annotated editions of the Institutes in the late eighteenth and early nineteenth centuries. The full quote can be found at 1 Edward Coke, The First Part of the Institutes of the Laws of England, book 2, ch. 12, § 234 n.4 [§ 156.a. n.4] (Francis Hargrave & Charles Butler eds., 19th ed. 1832).

asked, "Why should it be assumed that a juror, merely because of employment by the Government, would be biased against the accused?  In criminal prosecutions the Government is acting simply as the instrument of the public in enforcing penal laws for the protection of society."  *Id.* at 149.  In other words, although the federal government is technically a party in federal criminal prosecutions, we assume it seeks justice rather than its own self-interest.  Because the government's self-interest was not at stake, according to *Wood*, its employees would not be tempted to prejudge the case for their employer's benefit.

This reasoning has no relevance to municipal employees in a civil case.  Las Cruces is being sued for millions of dollars, it wishes to keep its millions of dollars, and its employees might have any number of reasons for sharing its wish.

*5. Implausibility of retaliation.*  Fifth, *Wood* rejected the suggestion "that an employee of the Government may be apprehensive of the termination of his employment" if the government loses its case.  *Id.* at 150.  The Court thought that a federal employee would fear for his job only in "some special and exceptional case," and thus the possibility of bias arising from such a fear was "remote" and "insignificant."  *Id.*

Today's majority quotes this language as if it applied universally to all governments—as if governments, merely by virtue of being governments, were unlikely to retaliate against employees who displeased them.  But merely glancing at *Wood*'s facts suggests otherwise.  In *Wood*, the jurors were clerks in the Weather Bureau, the Federal Emergency Administration, the Treasury, and the Navy Yard.  *Id.* at 131.  Why would the Weather Bureau care if the government lost a petit larceny case?  Why would it even

know?  The idea that agencies like these would take revenge on behalf of the D.C. police is indeed "far-fetched and chimerical."  *Id.* at 150.

But in our case the juror was employed by the same municipal corporation that was being sued; his livelihood was at the mercy of the same city council that would have to satisfy any judgment.  I do not know whether Las Cruces would have retaliated, but I am certain there are cities that would.  Moreover, even if a city would not in fact retaliate, its employee might reasonably fear retaliation in a way a federal employee would not.  Even if "cessation of [the juror's] employment would [not] actually follow a verdict, . . . [i]t is enough that it might possibly be the case."  *Crawford*, 212 U.S. at 196–97.  No one facing such a risk should be allowed to sit on a jury.  *Id.*

*6.  Public respect for the judicial process*.  Finally, the *Wood* Court rejected the argument that allowing federal employees to serve as jurors would "impair the public respect in which the processes of the law should be held."  299 U.S. at 150*.*  It did so because it was so hard to imagine that the jurors' employment would improperly influence their verdict.

In contrast, it is not hard at all to imagine that a municipal employee's verdict might be influenced by fear of retaliation or by concern for his employer's financial well-being.  Further, while I agree that no one would doubt the *Wood* jurors' impartiality based solely on their employment, I believe many reasonable people would wonder whether Zia Shadows got a fair trial.  And as *Crawford* put it,

> To maintain [the system of trial by jury] in the respect and affection of the
> citizens of this country it is requisite that the jurors chosen should not only

in fact be fair and impartial, but that they should not occupy such relation to either side as to lead, on that account, to any doubt on that subject.

212 U.S. at 195.

In short, all of the reasons for disqualifying parties' employees are relevant today: an employee's subconscious tendencies to favor his employer, to which our juror frankly admitted; his financial dependence on his employer; his possible fear of retaliation;[4] and the need to preserve public confidence in the jury process by disqualifying not only jurors who are actually biased, but even those who reasonably look biased.

In contrast, none of the Supreme Court's reasons for exempting federal employees have any force here. The common-law exception *Wood* relied on does not apply. Disqualifying municipal employees will not lead to a juror shortage. Congress has not spoken, and Las Cruces' self-interest is most certainly at stake. Finally, because the possibility of retaliation is much more than "chimerical," the idea that city employees do not fear retaliation—simply because they work for the government—is itself "far-fetched." A municipal employee should never be allowed to decide a civil case in which her employer is a party.

## CONCLUSION

While the reasons for disqualifying parties' employees have not changed since *Crawford*, one thing has changed: it has become much more expensive to obtain a jury

---

[4] Indeed the likelihood of retaliation might actually be greater for a municipal employee than for the employee of a private corporation like Wal-Mart: verdicts against private corporations do not lead to tax increases, or to the public outrage they sometimes provoke.

verdict. It has thus become a much weightier decision to vacate a jury verdict—a decision that inflicts immense cost and inconvenience on parties and jurors, a decision that appellate courts instinctively prefer to avoid unless a real injustice has been done.

This instinct, conscious or not, might make an appeals court uncomfortable with clear implied-bias rules. Implied bias rulings are reviewed without deference, and if the trial court seats an impliedly-biased juror over a party's objection, the appellate court must reverse even if the juror was not actually biased, and even if the verdict is plainly correct. The only way to avoid reversal is to avoid finding implied bias.

Thus, the instinct to avoid reversal tempts appeals courts to make the implied bias doctrine flexible and context-sensitive rather than specific and defined—in short, to turn appellate review of implied bias rulings into a second search for actual bias. With such flexibility, the appeals court can choose to find bias only when it is confident, based on the specific facts of the case, that it should reverse.[5]

This temptation toward flexibility should be resisted. The whole reason for the implied bias doctrine is that certain categories of individuals, due to their relationships with the parties or other "extraordinary situations," cannot serve on a jury without calling

---

[5] For example, under the Ninth Circuit's implied bias doctrine, an accused bank robber may not be convicted by jurors who are employed at another branch of the bank he is accused of robbing. *United States v. Allsup*, 566 F.2d 68, 71–72 (9th Cir. 1977). But a court applying that doctrine concluded that it did not disqualify a maintenance supervisor employed by the company whose gas station had been robbed—on the grounds that gas station robberies are not as frightening to maintenance supervisors as bank robberies are to employees at a bank branch. *Caviness v. Runnels*, No. CIV S-04-2629 MCE JFM P., 2007 WL 1454279, at *10–11 (E.D. Cal. May 17, 2007). This sort of fact-intensive, contextual inquiry should be left to trial courts examining jurors for actual bias, and then reviewed only deferentially thereafter.

-11-

the verdict's fairness into question. *Vasey*, 29 F.3d at 1468. A specific, defined implied bias rule allows a trial court to decide, quickly and easily, whether a juror belongs to such a category. In contrast, a flexible, context-dependent rule requires extensive fact-finding—the facts needed to prove a real likelihood of retaliation against a specific juror, for example, are not fundamentally different from the facts needed to prove a whole retaliation claim. And even after this extensive fact-finding, fact-finding totally out of place in the hurried context of voir dire, a trial court would have little certainty whether it faced an "extraordinary" situation or just an unusual one.

A flexible implied bias doctrine thus does little to protect the fairness of the trial in advance, when jurors can be dismissed without invalidating a verdict. Then, on appeal, a flexible implied bias doctrine invites courts to issue context-sensitive affirmances, based on the totality of the evidence, even in those few "extraordinary situations" where a reasonable person could not help but question the juror's impartiality. Such context-sensitive affirmances, with their necessarily vague holdings, cannot possibly assuage the doubts of the public or of the losing party. Rather the opposite is true.

An employment relationship with a party is an extraordinary situation requiring exclusion of a juror for implied bias. This court has said so. The Supreme Court has said so. I would thus remand for a new trial.